(907 P.2d 923)

No. 73,038

DAN H. ARMSTRONG, *Appellee*, v. CITY OF WICHITA, *Appellant*.

Opinion filed December 15, 1995.

*David J. Morgan*, of Hershberger, Patterson, Jones & Roth, L.C., of Wichita, for the appellant.

*Kelly W. Johnston* and *James P. Johnston*, of The Johnston Law Offices, P.A., of Wichita, for the appellee.

Before GERNON, P.J., LEWIS, J., and ROBERT G. JONES, District Judge, assigned.

LEWIS, J.: The Kansas Workers Compensation Board (Board) found that Dan Armstrong, the claimant, "suffers a condition as a result of his exposure to chemicals at work which has resulted in a disability." Claimant was determined to be 100 percent temporarily disabled. This decision affirmed an earlier decision in favor of claimant by the administrative law judge (ALJ). The City of Wichita (City) appeals from these decisions in favor of claimant and particularly from the finding that claimant suffered from an occupational disease.

Claimant was employed by the City in its sewer department. Claimant's job was to remove the floating solids and grease from the sewage at Plant No. 1 and transport the solids to the landfill.

In March 1989, claimant became ill at work. He noticed that the greases were of an unusual color and texture. He also detected a "terrible" pesticide-type odor and soon developed headaches and nausea. Although claimant put on a filter mask, he could still smell the odor and, within a day and a half, was so ill that he could not continue to work.

Initially, claimant saw the City's doctors for treatment. Ultimately, however, he began to see Dr. Charles T. Hinshaw, Jr., who remains his treating physician.

Dr. Hinshaw allowed claimant to return to work as a meter reader. In October 1989, claimant was again exposed to a spray of chemicals from a commercial carpet cleaner while at work. As a result of this exposure, claimant became ill and required assistance in driving his vehicle back to the City's garage.

Claimant returned to work on December 30, 1991. On that date, he was supplied with a respirator. The respirator emitted a petroleum odor, which made claimant ill, and he could not continue to work. The City supplied another respirator, which claimant said

emitted a silicone odor, and that made him ill. Ultimately, claimant was unable to work at all for the City. Since claimant's last day of work for the City, he has not worked for pay elsewhere, with the exception of 2 or 3 days when he helped a friend do construction work.

Claimant filed a claim for workers compensation by reason of having contracted an occupational disease. He testified that he suffered from and continues to suffer from weakness, confusion, headaches, tingling in his legs, tremors, diarrhea, and fatigue. He insists that none of these conditions were present prior to the March and October 1989 episodes while he was employed by the City.

Claimant was diagnosed by Dr. Hinshaw with multiple chemical sensitivities (MCS) resulting from his exposure to toxic chemicals at work. According to Dr. Hinshaw, claimant is 90 to 100 percent disabled as a result of his work-related condition.

The record in this case is quite extensive. It contains 34 volumes and testimony from at least 10 expert witnesses. Among those expert witnesses were seven M.D.'s and three Ph.D.'s.

The various expert witnesses in this case testified, to a greater or lesser degree, as to what was or was not wrong with claimant, how he may have developed that condition, and the extent of his disability. The testimony is highly conflicting.

Dr. Stephen Sparks examined claimant for the City. At one point, Dr. Sparks indicated that claimant's symptom complex was "consistent with chronic fatigue syndrome or multiple chemical sensitivity." Dr. Sparks further indicated that claimant had some level of impairment but ultimately testified that he could not say if it was related to the chemical exposure.

Dr. Lawrence L. Pelletier reviewed claimant's records and conducted an examination of claimant. His discharge summary diagnosed "peripheral neuropathy of unknown etiology."

Dr. Ronald E. Gots testified on behalf of the City. His testimony was not favorable to claimant. He testified that MCS did not exist and was not a recognized condition among the scientific community and further that claimant did not have it. He was asked:

"Q. Therefore, would you have rendered any treatment to Mr. Armstrong?
"A. No.

"Q. What would you have recommended that he do?
"A. I probably would have gotten him the kind of therapy that might have actually helped him.
"Q. Which was what?
"A. It may be psychiatric."

Dr. W. Morgan Padgett holds a Ph.D in chemistry. He testified that claimant was exposed to various noxious and/or toxic odors while working for the City.

Dr. Jai H. Yang, M.D., found that claimant was suffering from "borderline slow conduction velocity of the right sural sensory nerve."

Dr. Sparks, whose testimony is mentioned earlier, testified that claimant was impaired but that he could not say within a reasonable degree of medical probability that "anything" caused claimant's impairment.

After hearing the highly conflicting testimony in this case, the ALJ held that claimant suffers from MCS as a result of exposure to substances at work. He also found that claimant's exposure to those substances at work was of a greater concentration and frequency than that of the general public. He found claimant to be 100 percent temporarily totally disabled.

The Board affirmed the award of the ALJ. However, the Board declined to decide whether claimant suffers from MCS or even whether that condition exists. The Board concluded that claimant suffered from some condition "as a result of his exposure to chemicals at work which has resulted in a disability." The Board went on to make all of the other necessary findings required in order for an occupational disease to be compensable. The Board affirmed that claimant suffered from 100 percent temporary total disability.

The City appeals.

## NAME OF DISEASE

The Board held as follows:

"The Appeals Board does not consider it necessary to determine whether there is such a condition as multiple chemical sensitivity or whether claimant has such a chemical sensitivity. It is, in general, a diagnosis which describes a condition or circumstance where an individual has been exposed to one or more chemicals, sometimes at relatively low levels, and as a result develops hypersensitivity to

numerous other chemicals. Likewise there does not appear to be any uniformly accepted criteria for diagnosis of the condition. In fact, it appears that the diagnosis is made, in large part, by eliminating any other possibility. Without expressly finding that such a diagnosis is a valid diagnosis, the Appeals Board does conclude, from the evidence presented, that claimant suffers a condition as a result of his exposure to chemicals at work which has resulted in a disability."

The City argues that the Board erred in not naming the specific disease from which claimant suffers. The City argues that there must be a specific, recognized, and defined disease and diagnosis before a claim can be compensable as an occupational disease. The City suggests that we should remand this matter to the Board for a specific finding of the name of the ailment from which claimant suffers.

We do not agree.

The statute defining occupational disease does not require that a worker's disease be specifically defined and named in order to be compensable. K.S.A. 44-5a01(b) provides that an occupational disease

"shall mean only a disease arising out of and in the course of the employment resulting from the nature of the employment in which the employee was engaged under such employer, and which was actually contracted while so engaged. 'Nature of the employment' shall mean, for purposes of this section, that to the occupation, trade or employment in which the employee was engaged, there is attached a particular and peculiar hazard of such disease which distinguishes the employment from other occupations and employments, and which creates a hazard of such disease which is in excess of the hazard of such disease in general. The disease must appear to have had its origin in a special risk of such disease connected with the particular type of employment and to have resulted from that source as a reasonable consequence of the risk. Ordinary diseases of life and conditions to which the general public is or may be exposed to outside of the particular employment, and hazards of diseases and conditions attending employment in general, shall not be compensable as occupational diseases."

As we read the statute, it requires only that a claimant have a "disease," that the disease result from claimant's employment, and that it not be one of the ordinary "diseases of life." We see no requirement that a claimant's disease or condition have a name in order to be compensable.

"Interpretation of a statute is a question of law. An appellate court's review of a question of law is unlimited." *Foulk v. Colonial*

*Terrace,* 20 Kan. App. 2d 277, Syl. ¶ 1, 887 P.2d 140 (1994), *rev. denied* 257 Kan. 1091 (1995). "When construing a statute, a court should give words in common usage their natural and ordinary meaning." *Bank IV Wichita v. Plein,* 250 Kan. 701, 705-06, 830 P.2d 29 (1992).

The statute requires only that claimant have a disease. The term "disease" is one of common usage and has been defined as follows:

"an impairment of the normal state of the living animal or plant body or of any of its components that interrupts or modifies the performance of the vital functions, being a response to environmental factors (as malnutrition, industrial hazards, or climate), to specific infective agents (as worms, bacteria, or viruses), to inherent defects of the organism (as various genetic anomalies), or to combinations of these factors." Webster's Third New International Dictionary, p. 648 (1986).

We have earlier alluded to the complex state of the record. The medical testimony in this case was highly conflicting, and none of the physicians appeared to agree as to whether claimant was sick and, if so, what was wrong with him. The testimony of claimant, however, was consistent. He testified that he was sick, that he had been sick since an exposure to something while working for the City, and that he was still so sick that he could not work.

In summary, the record in this case shows a claimant who was ill. He can no longer work; he exhibits a variety of symptoms which he describes in detail and which are largely unchallenged. He traces his illness to an exposure to something floating around in the Wichita sewer lines. He was never the same after that exposure. It seems obvious that something is wrong with claimant, but no two of the expert witnesses can agree on what it is. In the face of this confusion, the Board concluded that claimant is sick, that he has a condition or disease that he contracted while working for the City, and that it is this disease that is making him sick. No two experts can agree on what it is, so the Board stated it does not matter whether it has a name—claimant is sick, and his sickness is compensable.

We agree with the Board. The role of the expert medical witness in workers compensation actions has never been elevated to the role it plays in civil actions. "In this jurisdiction it is not essential that the duration of disability or incapacity of a workman be estab-

lished by medical testimony." *Hardman v. City of Iola*, 219 Kan. 840, 845, 549 P.2d 1013 (1976).

It has long been the rule in cases involving accidental injuries under the Act that the name of the worker's disability is of no great importance: "The existence, nature and extent of the disability of an injured workman is a question of fact. *Medical testimony is not essential to the establishment of these facts and it is not necessary that a workman's disability be given a medical name or label."* (Emphasis added.) *Chinn v. Gay & Taylor, Inc.*, 219 Kan. 196, Syl. ¶ 3, 547 P.2d 751 (1976). See *Reese v. Gas Engineering & Construction Co.*, 219 Kan. 536, 541, 548 P.2d 746 (1976). In *Chinn v. Gay & Taylor*, the court went on to elaborate:

> "Appellants assert a factual distinction exists because no specific medical term was used in definition of appellee's back condition. *This is of little or no moment.* Where death does not result compensation for accidental injury to the body is payable for disability. (K.S.A. 44-510c, since amended). The existence, nature and extent of the disability of an injured workman is a question of fact. [Citations omitted.] Medical testimony is not essential to the establishment of these facts [citation omitted]; hence it is not necessary that a workman's disability be given a medical name or label. . . . It was not fatal to appellee's claim that his back condition was not described or diagnosed in precise medical terms." 219 Kan. at 201.

We adopt the reasoning of *Chinn v. Gay & Taylor* and other like cases and extend that reasoning to cases involving occupational disease. While the medical testimony may be of greater value in an occupational disease case, we decline to hold that a worker's illness is not compensable simply because the medical experts cannot give it a name. We do not believe that the legislature intended to deny compensation to a worker who is disabled by a condition which baffles medical experts and which resists their efforts to give it a specific name or diagnosis. No doubt, thousands of people died of AIDS before our medical community was able to agree on a specific diagnosis of that condition or the specific name. Notwithstanding the lack of a name for their disease, these people were sick and they died. They remain dead to this day. Chronic fatigue syndrome is the name of a condition relatively new in the medical lexicon. Yet, surely there were thousands of people who suffered

from that disorder before it had a name. A claimant in a workers compensation proceeding need only prove that he or she suffers from a disease contracted as a result of his or her employment by the respondent. It is of no great moment that the condition from which a claimant suffers cannot be precisely diagnosed and named by the medical experts.

We hold that in order to be compensable, it is not necessary that the occupational disease causing a worker's disability have a specific name or diagnosis recognized by the majority of experts in the medical field. It is enough if it is shown that the worker is disabled and is disabled by a disease or condition which resulted from the nature of his or her employment and which meets the other requirements of K.S.A. 44-5a01(b).

## *DAUBERT* OR *FRYE*

The City next argues that Dr. Hinshaw's opinion, treatment, and diagnosis of claimant should not have been admitted. It asks that in reaching this conclusion we adopt the test set forth by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993). It points out to us that Dr. Hinshaw's testimony would not pass the *Daubert* test. We decline to apply *Daubert*.

The *Daubert* test applies only to the federal courts and, in the decision cited above, the Supreme Court concluded that it superseded the "general acceptance test" of *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). *Daubert* holds that *federal trial judges*, when determining admissibility of expert testimony, must assure that the proffered scientific evidence is both relevant and reliable. General acceptance in the scientific community is not necessarily a prerequisite to the admissibility of scientific evidence. 125 L. Ed. 2d at 485. The Supreme Court indicated that a proffer of expert scientific testimony "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." 125 L. Ed. 2d at 482.

The City argues that Dr. Hinshaw's opinion, treatment, and diagnosis of claimant does not pass the test set forth in *Daubert* and

should be declared inadmissible. We conclude that the City's position is without merit.

There are a number of reasons why we decline to apply the *Daubert* test. The most significant is that *Daubert* does not apply to Kansas cases. In this state, the test utilized is the "general acceptance" test set forth in *Frye*. As recently as June 1995, the Supreme Court reaffirmed the *Frye* test as the proper standard for admission of scientific evidence. *State v. Haddock*, 257 Kan. 964, 984, 897 P.2d 152 (1995); *State v. Hill*, 257 Kan. 774, 783, 895 P.2d 1238 (1995).

We reject the invitation to adopt *Daubert* and hold that the *Frye* test is the proper standard to be applied in Kansas when that standard is applicable.

We believe, however, that there is, in fact, no scientific standard of any kind to be applied to the admission of scientific evidence in workers compensation cases. In this state, neither the ALJ nor the Board are bound by technical rules of procedure. K.S.A. 44-523; see *Bahr v. Iowa Beef Processors, Inc.*, 8 Kan. App. 2d 627, 633, 663 P.2d 1144, *rev. denied* 233 Kan. 1091 (1983). "The rules of evidence, K.S.A. 60-401 *et seq.*, are not applicable in workers' compensation proceedings." *Box v. Cessna Aircraft Co.*, 236 Kan. 237, 243, 689 P.2d 871 (1984).

Given the relative equality that exists in compensation cases between lay testimony and expert testimony, it does not appear that claimant has any burden to show that his medical evidence meets any particular standard. A claimant's burden of proof in a workers compensation case is to prove that it is more probably true than not true that he or she suffers from a disabling physical condition which is the result of his or her work. To require a claimant to also prove that a diagnosis is one universally recognized by and agreed upon in the medical community is above and beyond the scope and nature of the Workers Compensation Act. To apply the *Daubert* or the *Frye* standard to a workers compensation case would be to apply technical rules of procedure to which neither the ALJ nor the Board are subject. It also would require us to apply our rules of evidence to those proceedings, and those rules of evidence have been held specifically not applicable.

We hold that in a workers compensation case involving occupational disease, a claimant is not required to prove that his treating physician's opinions, diagnosis, or treatment satisfy either the *Daubert* or the *Frye* tests.

In the alternative, we note that the City is in no position to raise this issue. It stipulated that all of Dr. Hinshaw's medical records involving claimant be admitted into evidence. Those records contain Dr. Hinshaw's diagnosis of claimant's condition and disability. It is too late at this point to close the barn door.

The City did not once object to the admissibility of Dr. Hinshaw's testimony. It is too late to do so now. "[I]ssues not raised before the hearing officer may not be raised on appeal." *Furthmyer v. Kansas Dept. of Revenue*, 256 Kan. 825, 827, 888 P.2d 832 (1995).

## SUFFICIENCY OF THE EVIDENCE

The City finally argues that the award of temporary total disability is not supported by substantial competent evidence. The City seems to feel it is somehow erroneous that the Board "merely adopted all positions of Dr. Hinshaw, rather than the positions of Drs. Ron Gots and Sparks." A decision as to which testimony the Board chooses to believe is one of the obligations of the Board as a finder of fact.

As we pointed out, the evidence is highly conflicting. Claimant presented the testimony of Dr. Hinshaw, who is a fellow of the American Academy of Environmental Medicine. The City presented the testimony of Dr. Ronald E. Gots, who testified that MCS does not exist and that claimant does not have it. Dr. Gots said the following of MCS: "In short, this entity is unproven, at best and is fringe medicine, at worst."

Despite the arguments of the City and despite the testimony of Dr. Gots, the Board chose to believe the testimony of Dr. Hinshaw. It had every right to do so. "If the expert medical witnesses cannot agree, who is to decide the case? Obviously, the court must make the decision, and by law it is qualified to do so." *Hanna v. Edward Gray Corporation*, 197 Kan. 793, 800, 421 P.2d 205 (1966).

We see no need to extend this opinion. The record shows substantial competent evidence that claimant was 100 percent temporary totally disabled and that he was disabled by a disease or condition contracted by him as the result of his employment with the City. The record further contains substantial competent evidence that the disease or condition from which claimant suffered satisfied all of the requirements of K.S.A. 44-5a01(b) as a compensable occupational disease.

There is no question but that a contrary finding would also be supported by the record. This court is not, however, a finder of fact. We do not reevaluate the evidence, nor do we weigh the evidence or determine which of the expert opinions we are inclined to adopt. Our job is to view the record in the light most favorable to claimant, the prevailing party, and when we do so, we have no choice but to hold there is substantial competent evidence to support the findings of the Board.

Affirmed.