No. 75,186

STATE OF KANSAS, *Appellee*, v. PERRY LEE ISLEY, Jr., *Appellant*.

(936 P.2d 275)

Opinion filed April 25, 1997.

*Randall L. Hodgkinson*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*Gwynne E. Harris*, assistant district attorney, argued the cause, and *Joan M. Hamilton*, district attorney, and *Carla J. Stovall*, attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: This is a criminal appeal from two convictions of aggravated indecent liberties transferred from the Court of Appeals pursuant to K.S.A. 20-3018(c). The defendant claims that evidence regarding the statistical probabilities resulting from the DNA Polymerase Chain Reaction (PCR) method were erroneously admitted. He further claims the failure to give a general criminal intent instruction requires reversal. For the reasons set forth below, we affirm.

On June 8, 1994, Perry Lee Isley, Jr., was charged with two counts of aggravated indecent liberties with a child in violation of K.S.A. 21-3504(a)(1). The charges arose from allegations that the defendant engaged in sexual intercourse with his niece, A.I., and her friend, C.B., both 14 years old. Despite his complete denial of any such acts, the defendant was convicted by a jury and sentenced, pursuant to the Kansas Sentencing Guidelines Act, to consecutive prison sentences of 69 months and 51 months.

The defendant and his wife lived in the basement of his brother's house. His brother's girlfriend and two of his nieces, including A.I., lived in the home also. A.I.'s friend, C.B., had recently been staying at the residence although her home was a few blocks away.

On the morning of April 29, 1994, C.B. remained home from school in order to go to a doctor's appointment. The other residents had gone to work or school. According to C.B., she was awakened by the defendant. He fought with her, restrained her hands with handcuffs, and removed their clothing. He then engaged in sexual intercourse with her.

C.B. testified that the defendant insisted she shower after the intercourse. He also insisted that she write and sign a note stating that she had had sex with the defendant for $60. The defendant took C.B. to the bank, withdrew money, and gave her $40. He told her he would pay her the other $20 later. The defendant's bank statement revealed a $200 withdrawal on that same day.

Upon returning home, C.B. wrote the defendant's name on a list of people with whom she had had sex. Beside the defendant's name, she wrote "rape." C.B. decided not to tell anyone what happened because she was afraid A.I. and her family would be angry with her.

C.B.'s sister discovered C.B.'s note and told A.I. A.I. and C.B.'s sister confronted C.B., and C.B. told them what had happened. A.I. showed C.B.'s list to her father. Her father testified that other than speak to the defendant, he chose to do nothing because he was not sure if he believed C.B.

Approximately 1 week after she found out about C.B.'s note, A.I. was awakened around 9 a.m. by the defendant. No one else was home. The defendant first questioned A.I. as to whether she and C.B. had talked about him. A.I. denied any conversation. The defendant then handcuffed A.I. and ordered her to walk downstairs to his room in the basement. Once there, he removed her clothing and engaged in sexual intercourse with her. A.I. testified that she believed the defendant had ejaculated. Further, she believed that blood stained the sheets because she was in the midst of her menstrual period.

The defendant removed the handcuffs, and A.I. dressed in the clothes she had been wearing. The defendant insisted that she take a shower. Prior to the shower, he told A.I. to write a note. In substance, the note stated that she never had had sex with the defendant. A.I. showered and replaced her clothes. However, the defendant told her to change into clean clothes. She went into her bedroom to change clothes and while there, hid her panties inside her dirty jeans. She did this so she could later prove what had happened. She placed all her dirty clothes in a pile of other clothes on the floor.

A.I. left the house and went to C.B.'s home to tell her what happened. A.I., C.B., and C.B.'s sister left to find A.I.'s father and his girlfriend. The entire group, including A.I.'s grandmother, who is also the defendant's mother, returned to the house to confront the defendant. During the altercation, A.I. retrieved her panties and gave them to her grandmother. A.I.'s father checked the de-

fendant's bed for bloodstains but found nothing. Despite discussions about A.I. going to the hospital, she did not go at that time.

A.I.'s father did not tell law enforcement authorities because he felt the punishment would not be adequate, and he felt it best to solve the problem within the family. He also did not want A.I.'s mother to know what had happened. Despite his wishes, A.I.'s sister told her mother 2 days later. A.I.'s mother immediately reported the incident to the police. She took her daughter to the hospital, where a rape kit was performed. The nurse noted that A.I had recent bruises on her wrists. A.I.'s panties were seized by the police.

The defendant testified on his own behalf. He denied having intercourse with A.I. or C.B. He did not remember what had occurred on the date C.B. claimed the intercourse had occurred. On the date A.I. claimed that the defendant had had intercourse with her, he remembered spending the day with a friend, David Patterson. This friend, who at the time of trial was in the county jail, also testified that he had spent the day with the defendant. The defendant's and Patterson's stories conflicted slightly in the details.

Mary Koch, a forensic scientist for the Kansas Bureau of Investigation (KBI) testified that she found seminal fluid on A.I.'s panties. Because she also found that both A.I. and the defendant carried the same genetic markers, she could not conclude that the substance was foreign to A.I. She recommended that further DNA analysis be done.

Because the KBI does not do certain DNA analyses, Koch had the semen sample, as well as blood samples from the defendant and A.I., sent to Cellmark Diagnostics, an independent DNA testing laboratory in Germantown, Maryland. Anjali Ranadive, a chemist and employee of Cellmark, testified on behalf of the State.

After hearing all the evidence, the jury convicted the defendant of both counts of aggravated indecent liberties with a child. Further facts necessary to fully resolve the alleged errors are set forth below.

## DNA EVIDENCE

The defendant challenges the admission of DNA evidence be-

cause such evidence lacked the required foundation for scientific evidence. The heart of the defendant's objection is that Anjali Ranadive was not a population geneticist but testified concerning statistical probabilities based upon her chemical analysis. The defendant contends that the derivation of statistical probabilities does not meet the *Frye* test. See *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923). He further suggests that Ranadive's testimony regarding a colleague's expertise violates his constitutional right to confrontation.

The semen stain from the panties of A.I. and blood samples taken from A.I. and the defendant were collected by the KBI and sent to Ranadive at Cellmark. Ranadive performed a PCR analysis on the samples. From the PCR results, Ranadive determined that the defendant could not be excluded as the donor of the semen. Ranadive also calculated that the frequency of the markings found in the semen sample was 1 in 18,000 Caucasians, 1 in 78,000 Hispanics, and 1 in 820,000 African Americans. The trial court noted that the defendant was part Hispanic. Several times, defense counsel objected to the statistics on the basis of relevancy and lack of foundation.

The general acceptance test set forth in *Frye*, 293 F. 1013, governs the admissibility of expert scientific evidence in Kansas in those situations wherein such a test or standard is required. *Armstrong v. City of Wichita*, 21 Kan. App. 2d 750, Syl ¶ 3, 907 P.2d 923 (1995), *rev. denied* 259 Kan. 927. DNA testing meets the *Frye* test in Kansas. *State v. Colbert*, 257 Kan. 896, 896 P.2d 1089 (1995); *State v. Hill*, 257 Kan. 774, 895 P.2d 1238 (1995); *State v. Dykes*, 252 Kan. 556, 847 P.2d 1214 (1993); *Smith v. Deppish*, 248 Kan. 217, 807 P.2d 144 (1991); see Bennett, *Admissibility Issues of Forensic DNA Evidence*, 44 Kan. L. Rev. 141, 150 (1995).

There are two basic DNA tests in common use today. The first test, often referred to as "genetic fingerprinting," was approved in Kansas in *Deppish*, 248 Kan. 217. In that case, this court examined the admissibility of restriction fragment length polymorphism (RFLP) analysis. *Deppish*, 248 Kan. at 233. After exploring in-depth the scientific concepts that underlie RFLP, we concluded:

"DNA print testing and the process of Restriction Fragment [Length] Polymorphism analysis have been recognized as reliable, have gained general acceptance in the scientific community, involve scientifically and professionally established techniques, and thus, meet the criteria for admissibility under the standard set forth in *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923)." *Deppish,* 248 Kan. 217, Syl. ¶ 6.

The second method of forensic DNA analysis, the PCR method used in the present case, was recognized in *Hill,* 257 Kan. 774. In this case, we discussed the differences between RFLP and PCR analysis:

"The newer PCR amplification procedure is less definitive [than RFLP] as it can only exclude an individual as being a possible donor of the sample. Thus, *the final result is that the tested individual is not the sample donor or the individual is within a certain percentage of the population which could have donated the sample.* The advantages of PCR as opposed to RFLP are that it is faster, cheaper, and capable of being performed at more facilities. Additionally, it can test samples too small and/or in too poor a condition to be tested by RFLP analysis." (Emphasis added.) *Hill,* 257 Kan. at 782.

After examining both the number of states that had allowed admission of PCR test results as well as the substance of the expert testimony before the trial court, we concluded that the PCR analysis met the *Frye* test. *Hill,* 257 Kan. 783-85; see *State v. Haddock,* 257 Kan. 964, 983-85, 897 P.2d 152 (1995); MacKnight, *The Polymerase Chain Reaction (PCR): The Second Generation of DNA Analysis Methods Takes the Stand,* 9 Santa Clara Computer & High Tech. L.J. 287, 299-300 (1993). We affirmed *Frye* as the basis for admission of expert scientific opinion:

"Before expert scientific opinion may be received into evidence, the basis of that opinion must be shown to be generally accepted as reliable within the expert's particular scientific field. If a new scientific technique's validity has not been generally accepted as reliable or is only regarded as an experimental technique, then expert testimony based upon its results should not be admitted into evidence." *Hill,* 257 Kan. 774, Syl. ¶ 4.

The defendant in the present case does not contend that PCR tests should never be admitted; he does not contend that *Hill* was wrongly decided. Instead, he charges that the testimony regarding the *statistical portion* of the PCR analysis lacks foundation in the present case. The statistical analysis portion of both RFLP and

PCR is undeniably an important step in DNA testing for forensics purposes.

"Whether a match occurs . . . has no evidentiary significance unless the match is statistically significant. In other words, if a large percentage of the general population would match the crime scene sample, the match is not very incriminating to a particular suspect." Bennett, 44 Kan. L. Rev. at 150.

In *Colbert*, 257 Kan. 896, we addressed a remarkably similar question to the one we are called upon to decide in this case. In *Colbert*, the defendant was convicted of a series of five rapes. At trial, a KBI forensic scientist specializing in DNA analysis testified that the characteristics of DNA taken from the defendant's known blood sample matched that of DNA collected from each of the victims. In addition, the expert testified to the statistical probability of selecting an unrelated individual at random from the population having a matching DNA profile.

Cross-examination of the expert was summarized by the *Colbert* court as follows:

"[T]he expert acknowledged that he could not speak for the entire scientific community as to whether the publications of the Committee on DNA Technology and Forensic Science are generally accepted. The expert admitted that he was not an expert in population genetics. Defense counsel then proceeded to read several portions of a Committee report which stated that 'the genetic correlation among relatives warrants caution in the statistical interpretation of DNA typing results.' When asked how the FBI or KBI population data base represents the actual population of Coffeyville, Kansas, [the location of the crimes] the expert stated that he was not qualified to answer that question." 257 Kan. at 908.

Much like the defendant in this case, Colbert argued on appeal that "there was inadequate foundation for admission of the DNA evidence at trial because the State's expert was not qualified to discuss the methodology by which the data base was gathered or explain how the data base related to the population in the Coffeyville area." 257 Kan. at 908. We rejected Colbert's argument as contrary to Kansas precedent, noting the holdings of *Deppish* and *Dykes. Colbert*, 257 Kan. at 909. We concluded:

"Given this court's previous decisions, defense counsel's arguments concerning the accuracy of the statistical probability of the KBI reports from the DNA analysis were directed at the weight to be given the evidence by the jury, not its admis-

sibility. The trial judge did not abuse his discretion in admitting the DNA evidence." 257 Kan. at 910.

In *Dykes*, 252 Kan. 556, we discussed the database used to determine the probability statistics used in an RFLP analysis. Dykes was charged with rape, among other crimes. A rape kit analysis revealed the presence of semen on the victim's clothes. The semen sample and a known blood sample of the defendant were sent to the FBI for analysis.

At trial, an FBI special agent testified about the result of the DNA analysis. He stated that the DNA in the semen and the blood sample matched. He determined that the test did not exclude the defendant as the source of the semen. Finally, he testified that "the probability of selecting another unrelated individual chosen at random from the black population having a profile similar to Dykes' [was] approximately one in six million." 252 Kan. at 557.

The defendant appealed the trial court's refusal to grant discovery of the FBI's black population database used to calculate the probability statistics. This court affirmed the trial court's decision. First, this court cited *Deppish* for the proposition that population studies have longstanding acceptance in Kansas courts. We also said:

"[In *Deppish* w]e noted that statistics based on population studies are admissible and that any challenge to the reliability of the testimony goes to its weight, not its admissibility, citing *State v. Washington*, 229 Kan. 47, 58-59, 622 P.2d 986 (1981). We held that population percentages on the possession of certain combination of blood characteristics, based upon established facts, are admissible as relevant to identification. The data base was not novel to the defendant's case. The FBI's data base is used in all criminal cases." *Dykes*, 252 Kan. at 562.

Second, we cited with approval the holding in *State v. Montalbo*, 73 Hawaii 130, 828 P.2d 1274 (1992):

"There, the court found little basis for concern over the theory underlying the statistical evidence. It noted that the statistics and the underlying sampling theory are not novel or controversial. It took judicial notice that the DNA paradigm is not controversial and is widely accepted in the relevant scientific community. It also recognized that the basic techniques underlying the analysis used by the FBI are widely accepted. [Citations omitted.] It further noted the theory of DNA testing is 'unanimously accepted amongst scientists and lawyers' and techniques are not novel but it is the transfer of the technique to the context of DNA forensic

identification which has generated much of the dispute. [Citation omitted.]" *Dykes*, 252 Kan. at 562.

Given the wide acceptance of the FBI's database, we concluded in *Dykes* that the defendant was unable to show that the material was relevant in the preparation of the defense, thereby upholding the denial of the discovery request. 252 Kan. at 563.

The defendant relies upon two Arizona cases to support his contention that Ranadive's testimony was erroneously admitted and prejudicial. See *State v. Johnson*, 183 Ariz. 623, 905 P.2d 1002 (Ct. App. 1995), *aff'd* 186 Ariz. 329, 922 P.2d 294 (1996), and *State v. Bible*, 175 Ariz. 549, 858 P.2d 1152 (1993), *cert. denied* 128 L. Ed. 2d 221 (1994). As discussed above in *Dykes*, 252 Kan. 556 and *Colbert*, 257 Kan. 896, Kansas has taken a different approach to statistical analysis than Arizona. We also note that *Bible* and *Johnson* address RFLP analysis, not the PCR analysis performed in the present case. The significance of this observation is explained by the following comment:

> "One strong advantage of RFLP is that it is possible to derive phenomenal probability statistics relating to the determination of whether a particular person is responsible for the crime under investigation. The greater the probability that the RFLP patterns observed in the evidence samples and the subject match, the greater the likelihood that the person is the one responsible for the crime. There are even methods which may be used to determine the identity of a suspect who claims that another family member was responsible for the crime. Thus, RFLP's 'power of discrimination' is potentially very high.
> "Because population genetics form the basis for these determinations, there has been much research into the genetic makeup of various human subpopulations. The methods used to estimate the probabilities are relatively complex. . . . [P]opulation genetics and the statistics used to produce impressive probabilities are a subject of concern to many commentators and expert witnesses.
> . . . .
> "Although some of the distrust associated with RFLP has overflowed into the PCR arena, the concerns with PCR are much different than those associated with RFLP. Also *because its power of discrimination is not as great as that of RFLP, such claims of unreliability based on skewed population genetics and statistics are not as applicable to PCR*." (Emphasis added.) MacKnight, 9 Santa Clara Computer & High Tech. L.J. at 299-300.

In *Bible*, the Arizona Supreme Court rejected the databases formulated by Cellmark which were used for the DNA analysis due

to widely acknowledged problems with the database. Even before the decision in *Bible*, Cellmark altered its use of databases. Ranadive stated in her testimony that Cellmark's current protocol is to compare its database with a database maintained by Roach Molecular System, an independent forensic laboratory. She explained that if statistics derived from the Roach database are more conservative, Cellmark adopts the more conservative statistics. Finally, Ranadive explained that Cellmark has implemented separate databases for racial subpopulations, thereby answering the criticism raised in *Bible*.

The objection of the defendant is based upon lack of foundation. However, as noted above, the statistical analysis portion of both RFLP and PCR testing meets the *Frye* test. As in *Colbert, Deppish*, and *Dykes*, the challenge to DNA statistical analysis goes to the weight of the evidence and not to the admissibility. See *Johnson v. State*, 326 Ark. 430, 934 S.W.2d 179 (1996); *Jenkins v. State*, 627 N.E.2d 789, 795 (Ind. 1993), *cert. denied* 130 L. Ed. 2d 21 (1994); *State v. Bloom*, 516 N.W.2d 159, 160 (Minn. 1994); *State v. Anderson* 118 N.M. 284, 294, 881 P.2d 29 (1994); *People v. Wesley*, 83 N.Y.2d 417, 422, 611 N.Y.S.2d 97, 633 N.E.2d 451 (1994); MacKnight, 9 Santa Clara Computer & High Tech. L.J. at 329-30. We conclude that the trial court did not abuse its discretion by admitting the DNA evidence population database and statistics emanating therefrom.

## GENERAL CRIMINAL INTENT INSTRUCTION

The defendant argues that we must reverse because the district court failed to instruct the jury on general criminal intent in accord with K.S.A. 21-3201, which provides:

"(a) Except as otherwise provided, a criminal intent is an essential element of every crime defined by this code. Criminal intent may be established by proof that the conduct of the accused person was intentional or reckless. Proof of intentional conduct shall be required to establish criminal intent, unless the statute defining the crime expressly provides that the prohibited act is criminal if done in a reckless manner."

He argues that intent is an essential element of the charge of aggravated indecent liberties and the failure to instruct denied him of due process of law.

The defendant did not object to the instructions given. In *State v. DePriest*, 258 Kan. 596, 605, 907 P.2d 868 (1995), we said:

" '[N]o party may assign as error the giving or failure to give an instruction unless he or she objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he or she objects and the grounds for the objection, unless the instruction is clearly erroneous. K.S.A. 22-3414(3). An instruction is clearly erroneous only if the reviewing court reaches a firm conviction that if the trial error had not occurred there is a real possibility the jury would have returned a different verdict.' [Citations omitted.]"

We do not reach such a conviction. Our review of all the evidence viewed in a light most favorable to the State, provides overwhelming evidence of the defendant's intent. The defendant planned the events to occur when no other person was in the house. He used handcuffs. He insisted that the victims take showers following the incident and ordered each victim to write a note denying the crime. Under all circumstances, there is no real possibility that giving a general intent instruction would have changed the result of this trial. The defendant has failed to establish that such failure to instruct was clearly erroneous.

Recently, we addressed a similar issue in *State v. Plunkett*, 261 Kan. 1024, 934 P.2d 113 (1997). In *Plunkett*, the defendant was charged with rape and the trial court did not instruct the jury upon the issue of general criminal intent. On appeal, Plunkett argued that because general criminal intent is a element of rape, under K.S.A. 21-3201 (Ensley 1988), the State must prove that Plunkett intended to have nonconsensual intercourse. In response to this argument, we said that the defendant's argument would add an additional element to the crime of rape not included in the statute. "K.S.A. 21-3502 (Ensley 1988) does not require proof that the defendant intended to have nonconsensual intercourse. The statute requires proof that the defendant had sexual intercourse without the victim's consent when the victim was overcome by force or fear." 261 Kan. at 1030-31.

The same may be said in this case. All parties agree under the facts of this case that aggravated indecent liberties is a general intent crime. To be found guilty of aggravated indecent liberties with a child, as defined in K.S.A. 21-3504(a)(1), the State must

only show that the defendant had sexual intercourse with the victims at a time when both victims were 14 or more years of age, but less than 16 years of age. No proof of his knowledge of their age is required pursuant to K.S.A. 21-3202(2), which provides: "Proof of criminal intent does not require proof that the accused had knowledge of the age of a minor, even though age is a material element of the crime with which he is charged." The only proof required for general criminal intent is that the defendant's conduct consist of a willful or wanton act. *State v. Farris*, 218 Kan. 136, 141, 542 P.2d 725 (1975). See *State v. Lucas*, 221 Kan. 88, 90-91, 557 P.2d 1296 (1976).

As in *Plunkett*, if we were to adopt the defendant's contention that general intent is an essential element of the offense, we would be adding an additional element to the crime of aggravated indecent liberties not included in the statute. K.S.A. 21-3504(a)(1) does not require proof that the defendant *intended* to have intercourse with the victims under the age of 14. The statute only requires proof that the defendant had sexual intercourse with the victims.

The district court instructed on two counts of aggravated indecent liberties with a child and provided the jury with a definition of sexual intercourse. The instruction on aggravated indecent liberties given by the trial court is set forth below and tracks PIK Crim. 3d 57.06:

"The defendant, Perry Lee Isley, Jr., is charged in count one of the complaint with the crime of aggravated indecent liberties with a child. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved by the State beyond a reasonable doubt:

"1. That the defendant, Perry Lee Isley, Jr., had sexual intercourse with A.I.;

"2. That at such time, A.I. was a child 14 or more years of age but less than 16 years of age; and

"3. That this act occurred on or about the 3rd day of June, 1994, in Shawnee County, Kansas."

Neither the PIK instruction nor the trial court's instruction in this case includes the word "intentionally." Under K.S.A. 21-3504(a)(1), the word "intentionally" was properly excluded. We conclude that the district court did not err in omitting "intention-

ally" from the aggravated indecent liberties instruction. See *Plunkett*, 261 Kan. at 1031.

Moreover, in *Plunkett* we note that the Kansas Judicial Council, in its Notes on Use, does not recommend the general criminal intent instruction for general use:

"This instruction [PIK Crim. 3d 54.01-A] is not recommended for general use. The PIK instruction defining the crime should cover either specific or general criminal intent as an element of the crime. *This instruction should be used only where the crime requires only a general criminal intent and the state of mind of the defendant is a substantial issue in the case.*" (Emphasis added.) PIK Crim. 3d 54.01-A, Notes on Use.

In *Plunkett*, we found no error when the trial court did not give a general intent instruction under PIK Crim. 3d 54.01-A where the defendant was charged with rape, a general intent crime, and where the state of mind of the defendant was not in issue. The defendant in *Plunkett* admitted intercourse but claimed it was consensual. In this case, the state of mind of the defendant is not an issue. The only question before the jury was whether the defendant engaged in sexual intercourse with the victims. The trial court's action in not giving a general intent instruction was consistent with our holding in *Plunkett* and provides no basis for reversal.

Affirmed.