(208 P.3d 793)
No. 100,890

STATE OF KANSAS, *Appellee*, v. ROBERT HENRY LACKEY, II,
*Appellant*.

Petition for review granted June 24, 2010.

Opinion filed June 12, 2009.

*Gerald E. Wells*, of Lawrence, for appellant.

*Nicole Romine*, assistant county attorney, *Ellen H. Mitchell*, county attorney, and *Steve Six*, attorney general, for appellee.

Before McAnany, P.J., Green and Caplinger, JJ.

Green, J.: Robert Henry Lackey, II, appeals from the trial court's summary denial of his motion for DNA testing under K.S.A. 21-2512. Lackey contends that the trial court erred in failing to conduct an evidentiary hearing on his motion for DNA testing. Nevertheless, the files and records available to the trial court established that even if the additional DNA testing requested by Lackey were to be performed, such testing could not produce exculpatory evidence. Accordingly, we affirm.

Most of the facts pertaining to Lackey's criminal convictions are taken from our Supreme Court's decision in *State v. Lackey*, 280 Kan. 190, 120 P.3d 332 (2005); *cert. denied* 547 U.S. 1056 (2006). Lackey was convicted by a jury of premeditated first-degree murder in violation of K.S.A. 21-3401(a) (Ensley 1981) and rape in violation of K.S.A. 21-3502 (Ensley 1981), for crimes committed in December 1982.

In 1982, the victim, S.B., was a 22-year-old college student who was volunteering at a mission in Salina. Lackey was a transient who was staying at the mission and working as a cook. Lackey went by the name Bob Moore. S.B. and Lackey became friends and socialized outside of the mission. Lackey wanted to date S.B., but she had rebuffed his sexual advances and indicated that she only wanted to be friends. S.B. was dating Jay Czarnowski, and he had a key to her residence.

On December 9, 1982, Czarnowski and S.B. got into an argument at her residence about his plans to go home for the weekend. Czarnowski and S.B. later made up and had unprotected sexual intercourse. Czarnowski traveled to his home the next day. On December 10, 1982, S.B. spoke with both her mother and sister

on the telephone. S.B.'s mother tried to call her several times throughout the next week but was unable to reach her. At S.B.'s mother's request, S.B.'s landlord checked S.B.'s residence on December 16, 1982, but was unable to find her.

During the late afternoon and early evening of December 11, 1982, Lackey was drinking at a local tavern. Lackey told the bartender that he was drunk and between 6 and 7 p.m. asked her to call him a cab. One of the tavern's customers saw Lackey at the tavern that evening and recalled that Lackey had asked the bartender to call him a cab to take him to the trailer park where S.B. lived. The customer specifically recalled the name of the trailer park because she lived across the street from it and had considered offering Lackey a ride. Yellow Cab radio logs showed that one of its cab drivers had picked up a fare at 6:17 p.m. on December 11, 1982, from the tavern and had taken the fare to a convenience store about a block and a half from S.B.'s residence. The logs further indicated that a fare was picked up from the convenience store at 10:50 p.m. and taken to the mission.

Reverend George Knight recalled that Lackey had returned to the mission around 10 or 11 p.m. on December 11, 1982. Knight smelled alcohol on Lackey's breath. Knight went home and returned to the mission at 7:30 the following morning to find that Lackey and his personal belongings were gone. A pair of men's underwear was later found underneath Lackey's bed at the mission.

When Czarnowski returned to Salina on either December 12 or 13, 1982, he attempted to contact S.B. at her residence, but S.B. was not home. Czarnowski returned to S.B's residence the next several days attempting to find her. Czarnowski spoke with S.B.'s neighbors and also looked for S.B. at the mission and several taverns. Czarnowski spent several nights at S.B.'s residence that week. By December 17, 1982, Czarnowski concluded that S.B. had left, and he decided that he was going to move his belongings out of her residence.

On the morning of December 18, 1982, while moving his belongings, Czarnowski found S.B.'s body in a closet in a back bedroom of her residence. When the investigating officer arrived at S.B.'s residence, he did not smell the odor of a decaying body.

There was a cold air return vent in the floor of the closet where S.B.'s body was found. The county coroner determined that S.B. had died of strangulation and estimated that she had been dead 6 to 8 days when her body was found. The State's medical expert concluded that S.B.'s death had occurred at least 1 or 2 days before her body was discovered but that the maximum time could have been considerably longer.

Lackey became a suspect in the case, and an investigation was pursued. Nevertheless, the case went inactive for many years until a Kansas Bureau of Investigation (KBI) special agent and a Salina police detective resumed the investigation in November 1996. They received information from Canadian authorities that a Robert Moore had been involved in a 1982 homicide in Salina. Through the use of two Social Security numbers provided by the Canadian authorities, investigators learned the name Robert Lackey. Czarnowski and another friend of S.B. later identified a 1979 photograph of Lackey as the person they knew as Robert Moore. DNA testing of the body fluids on the underwear found underneath Lackey's bed at the mission was consistent with fluids found in S.B.'s rape kit.

The KBI special agent and the Salina police detective obtained an arrest warrant and tracked Lackey to Alabama. They interviewed Lackey at a sheriff's department in Alabama. Lackey told the officers that he had never been to Kansas when he was advised that someone named Robert Moore was using his Social Security number in Kansas. Lackey later said that he did not know S.B. or Robert Moore but that he may have been in Kansas in 1969 or 1970.

Lackey was extradited to Kansas in March 2002, and his blood was drawn for DNA testing. Lisa Burdett, a forensic scientist with the KBI, performed DNA testing on the vaginal, anal, and oral swabs taken from S.B.; scrapings from under S.B.'s fingernails; a cutting from the underwear found under Lackey's bed at the mission; and known bloodstains from Lackey and Czarnowski. Burdett's testimony established that the sperm cells found in S.B.'s vagina and on the cutting from the underwear were consistent with Lackey's DNA. The estimated probability of selecting an individual

at random from the general unrelated Caucasian population was 1 in 194 billion. Czarnowski was excluded as a possible contributor to the sperm cells found in S.B.'s vagina. Burdett never compared Czarnowski's bloodstains to the cuttings from the underwear.

Burdett testified that some of the DNA samples were "degradated" and "beginning to fall apart" and that she got a mixture of the male and female in the fingernail scraping from S.B.'s left hand and in the F1 fraction of the vaginal swabs. The F1 fraction of the vaginal swabs was separate from the sperm cells (F2 fraction) that she had already identified as consistent with Lackey's DNA. Nevertheless, Burdett was able to determine that the minor contributor to the DNA profile from S.B.'s fingernail scrapings on her left hand and the major contributor to the F1 fraction of the vaginal swabs were consistent with Lackey's DNA. Lackey could not be excluded as a possible contributor to the DNA profile from the victim's fingernail scrapings. Czarnowski, however, was eliminated as a contributor. Although the DNA obtained from the anal swabs indicated a mixture of male and female, Burdett testified that there was not enough genetic material present to do a comparison with a specific male profile.

The jury convicted Lackey of premeditated first-degree murder and rape. Under the Habitual Criminal Act (HCA), Lackey's sentence was enhanced to two consecutive terms of life imprisonment and 45 years to life. On direct appeal, our Supreme Court affirmed Lackey's convictions but vacated his sentence because competent evidence did not support a finding that Lackey had prior convictions to enhance his sentence under the HCA. 280 Kan. at 197, 235. On remand, Lackey was resentenced to consecutive sentences of life on his premeditated first-degree murder conviction and 45 years to life on his rape conviction.

In May 2007, Lackey, as a pro se litigant, moved for DNA testing under K.S.A. 21-2512. Lackey argued that the State had presented incompetent DNA test results at his trial. Moreover, Lackey argued that some DNA evidence samples had not been tested, including some short hairs found on the victim's body. Lackey requested that he be allowed to choose a DNA expert to examine the DNA testing procedures, the evidence samples, and the DNA test results and

to make recommendations of appropriate DNA tests. Lackey further requested that additional DNA testing be conducted on the fingernail scrapings and the underwear; that the DNA samples be compared against Czarnowski's DNA; and that DNA testing be performed on the short hairs found on the victim's body.

In a written order, the trial court summarily denied Lackey's motion for DNA testing. The trial court determined that the State had presented a proper foundation for the admission of the DNA evidence that had been admitted at trial; that the DNA techniques used by the State were representative of the latest techniques available for genetic testing; that Lackey failed to show that more accurate DNA testing techniques were available; and that Lackey's motion failed to state a cause of action for which relief may be granted under K.S.A. 21-2512. Lackey moved the trial court for reconsideration of its order. The trial court denied Lackey's motion for reconsideration.

On appeal, Lackey argues that the trial court erred in not granting his motion for DNA testing under K.S.A. 21-2512. Lackey's argument requires interpretation of K.S.A. 21-2512. Interpretation of a statute presents a question of law over which an appellate court has unlimited review. *State v. Storey*, 286 Kan. 7, 9-10, 179 P.3d 1137 (2008).

K.S.A. 21-2512(a), which governs a defendant's request for DNA testing, states as follows:

"(a) Notwithstanding any other provision of law, a person in state custody, at any time after conviction for murder as defined by K.S.A. 21-3401, and amendments thereto, or for rape as defined by K.S.A. 21-3502, and amendments thereto, may petition the court that entered the judgment for forensic DNA testing (deoxyribonucleic acid testing) of any biological material that:

(1) Is related to the investigation or prosecution that resulted in the conviction;

(2) is in the actual or constructive possession of the state; and

(3) was not previously subjected to DNA testing, or can be subjected to retesting with new DNA techniques that provide a reasonable likelihood of more accurate and probative results."

Once a defendant has filed his or her petition requesting DNA testing, K.S.A. 21-2512(b) requires the trial court to notify the pros-

ecutor of the petition and give the prosecutor an opportunity to respond:

"(b)(1) The court shall notify the prosecuting attorney of a petition made under subsection (a) and shall afford the prosecuting attorney an opportunity to respond.

"(2) Upon receiving notice of a petition made under subsection (a), the prosecuting attorney shall take such steps as are necessary to ensure that any remaining biological material that was secured in connection with the case is preserved pending the completion of proceedings under this section."

Under K.S.A. 21-2512(c), the trial court shall order DNA testing under the following circumstances:

"(c) The court shall order DNA testing pursuant to a petition made under subsection (a) upon a determination *that testing may produce noncumulative, exculpatory evidence relevant to the claim of the petitioner that the petitioner was wrongfully convicted or sentenced.*" (Emphasis added.)

The structure of Lackey's argument takes the form of a categorical syllogism:

Not all DNA samples were tested (Major Premise);

Hairs found on the victim's body were not tested (Minor Premise);

Therefore, the hairs found on the victim's body should be tested (Conclusion).

This argument suffers from a logical fallacy. First, from two negative premises, no conclusion can be drawn. Second, if one premise is negative, the conclusion must be negative. Lackey's syllogistic argument violates both Rules 4 and 5 of categorical syllogisms: it has two negative premises and an affirmative conclusion. See Aldisert, Logic for Lawyers, pp. 145-46 (3d ed. 1997).

In reading the subsections of K.S.A. 21-2512 in isolation, Lackey anchors his argument under K.S.A. 21-2512(a). Yet, Lackey's argument has no support when you read K.S.A. 21-2512(a) in combination with K.S.A. 21-2512(c). For example, before ordering DNA testing under K.S.A. 21-2512(a), the trial court must determine "that testing may produce noncumulative, exculpatory evidence relevant to the claim of the petitioner that the petitioner was wrongfully convicted or sentenced." K.S.A. 21-2512(c).

In determining legislative intent, courts are required to construe all provisions of a statute together. It is well established that "the provisions of a statute should be construed together and in their entirety in determining the purpose of the legislature in its enactment." *Natural Gas Pipeline Co. v. Commission of Revenue & Taxation*, 163 Kan. 458, 467, 183 P.2d 234 (1947). Moreover, courts must construe all parts of an act together in order to ascertain legislative intent:

"In order to ascertain the legislative intent, courts are not permitted to consider only a certain isolated part or parts of an act but are required to consider and construe together all parts thereof *in pari materia*. When the interpretation of some one section of an act according to the exact and literal import of its words would contravene the manifest purpose of the legislature, the entire act should be construed according to its spirit and reason, disregarding so far as may be necessary the literal import of words or phrases which conflict with the manifest purpose of the legislature. [Citation omitted.]" *Brown v. Keill*, 224 Kan. 195, 200, 580 P.2d 867 (1978).

" 'The several provisions of an act, *in pari materia*, must be construed together with a view of reconciling and bringing them into workable harmony and giving effect to the entire statute if it is reasonably possible to do so.' [Citation omitted.]" *Guardian Title Co. v. Bell*, 248 Kan. 146, 151, 805 P.2d 33 (1991). Courts should avoid interpreting a statute in such a way that part of it becomes meaningless, useless, or surplusage. *State v. Sedillos*, 279 Kan. 777, 783, 112 P.3d 854 (2005); *State v. Van Hoet*, 277 Kan. 815, 826-27, 89 P.3d 606 (2004).

When K.S.A. 21-2512(a) and (c) are not read in isolation but in combination with each other, the subsections can be construed in harmony as follows:

When DNA samples are capable of producing noncumulative, exculpatory evidence relevant to the claim of the petitioner that the petitioner was wrongly convicted or sentenced (K.S.A. 21-2512[c]);

and the samples relate to the investigation or prosecution that resulted in a conviction (K.S.A. 21-2512[a][1]);

and the samples are in the actual or constructive possession of the State (K.S.A. 21-2512[a][2]);

and the samples were not previously subjected to DNA testing or can be subjected to retesting with new DNA techniques that provide a reasonable likelihood of more accurate and probative results (K.S.A. 21-2512[a][3]), then the samples should be tested or retested.

Notice that K.S.A. 21-2512(a) and (c) would form the major premise of an argument of a defendant who is asking for DNA testing. From the major premise, the defendant would argue that DNA testing would produce exculpatory evidence relevant to the defendant being wrongly convicted. This would form the minor premise. If one accepts the major and minor premises, one cannot rationally deny the conclusion that would follow from the premises: that the defendant is entitled to DNA testing. Here, however, Lackey failed to show that DNA testing of the short hairs found on S.B.'s body would produce noncumulative, exculpatory evidence.

For example, Lackey points out that DNA testing had never been performed on short hairs found on S.B.'s body. While this might be true, DNA testing on the short hairs would not produce exculpatory evidence in this case when Lackey's DNA was consistent with the DNA found in S.B.'s vagina and underneath her fingernails. This is especially so since Lackey had denied knowing S.B. and denied being in Kansas when the crimes against S.B. were committed. With the strong DNA evidence linking Lackey to the crimes, Lackey's sudden flight from Kansas, and Lackey's denial of knowing S.B., DNA testing on the short hairs would not have indicated that Lackey was wrongfully convicted of the charged crimes. In other words, even if the short hairs on S.B.'s body were found to be consistent with another individual's DNA, they would not point to Lackey's innocence in the case, especially based on his story of not knowing S.B. and not being in Kansas when the crimes occurred. As a result, the key premise of Lackey's argument, anchored in K.S.A. 21-2512(a), therefore, has no support when you consider K.S.A. 21-2512(a) together with K.S.A. 21-2512(c). See *Kingsley v. Kansas Dept. of Revenue*, 288 Kan. 390, 402, 204 P.3d 562, 572 (2009) (citing *Kansas Commission on Civil Rights v. How-*

*ard,* 218 Kan. 248, Syl. ¶ 2, 544 P.2d 791 [1975] [Courts are not permitted to consider only a certain isolated part of parts of an act but are required to consider and construe together all parts thereof *in pari materia.*]).

In arguing that his motion for DNA testing was sufficient for the trial court to appoint counsel and conduct a hearing, Lackey cites *Bruner v. State,* 277 Kan. 603, 88 P.3d 214 (2004). In clarifying what the defendant is required to allege under K.S.A. 21-2512(a), our Supreme Court in *Bruner* stated:

> "K.S.A. 2003 Supp. 21-2512 does not require the prisoner to make specific allegations regarding how the DNA testing would produce noncumulative, exculpatory evidence. The statute merely requires the prisoner to allege that the evidence is related to the investigation or prosecution of his or her conviction, that the State has possession or constructive possession of the evidence, and that the evidence was not previously subjected to DNA testing or that it could be tested using new DNA testing techniques. K.S.A. 2003 Supp. 21-2512(a)." 277 Kan. at 606.

In *Bruner,* our Supreme Court determined that the defendant's failure to include specific assertions regarding what noncumulative, exculpatory evidence would be produced was not fatal to his request for DNA testing. Moreover, our Supreme Court held that to the extent 21-2512 may permit a " 'fishing expedition,' " it is an expedition that our legislature has concluded is worth conducting. 277 Kan. at 606. Our Supreme Court stated that the requirements of 21-2512(a) will limit the hearing's scope, and a request for DNA testing will be determined on a case-by-case basis. 277 Kan. at 606.

Our Supreme Court in *Bruner* seemed to consider subsection (a) of 21-2512 in isolation and did not specifically discuss how subsection (c), when construed in harmony with subsection (a), could bar relief to a movant. Perhaps that is because the arguments raised by the appellant in *Bruner* and the facts in the underlying criminal case were such that it was obvious that DNA testing could possibly produce noncumulative, exculpatory evidence. In fact, in determining that the appellant was entitled to appointment of counsel and a hearing on his request for DNA testing, our Supreme Court stated that "there is no reason to believe that testing of available

biological evidence might not produce noncumulative, exculpatory evidence." 277 Kan. at 606.

In *Bruner*, the appellant requested DNA testing under 21-2512 many years after he was convicted of first-degree murder. His first-degree murder conviction had been based on circumstantial evidence, none of which was biological evidence. Nevertheless, blood samples, skin samples from the victim's hands, and hair samples had been collected in the case. Our Supreme Court rejected the State's argument that the defendant's petition for DNA testing should be denied because the evidence against him was overwhelming:

"Our reading of the plain language of K.S.A. 2003 Supp. 21-2512 finds no reference limiting the statute to cases where the evidence was not overwhelming. Here, the evidence was circumstantial. While no part of the circumstantial evidence is biological, there is no reason to believe that testing of available biological evidence might not produce noncumulative, exculpatory evidence." 277 Kan. at 606.

Based on the facts of the case, our Supreme Court determined that the defendant was entitled to appointment of counsel and a hearing on his request for DNA testing under K.S.A. 21-2512.

Similarly, in *Goldsmith v. State*, 34 Kan. App. 2d 789, 124 P.3d 516 (2005), this court held that the defendant was entitled to appointment of counsel and an evidentiary hearing on his postconviction motion for DNA testing. In *Goldsmith*, a vast amount of physical evidence, including blood and saliva samples and bodily fluid swabs from the defendant and the victim, had been seized by the police in the underlying criminal investigation. No seminal fluid or blood connecting Goldsmith to the crime was discovered on the selected items tested by the State. Although a stipulation to that effect was read at trial, the jury convicted the defendant of all charged crimes. After his convictions, the defendant moved for DNA testing several times unsuccessfully. The defendant contended that the physical evidence which the KBI labs were unable to analyze could be analyzed by the Federal Bureau of Investigation (FBI). The defendant alleged that such physical evidence, when analyzed, would prove exculpatory. In addressing the defendant's argument that the trial court erred in summarily dis-

missing his latest motion for DNA testing, this court looked to our Supreme Court's decision in *Bruner*, 277 Kan. 603.

Applying our Supreme Court's decision in *Bruner*, this court in *Goldsmith* stated:

"Here, the State articulates no basis for a different result in this case. Admittedly, on the few biological items tested by the State, evidence was admitted indicating that no seminal fluid or blood tied the defendant to the crime, and the jury subsequently convicted the defendant from circumstantial evidence of guilt. However, a vast amount of physical evidence was seized by the police in the underlying criminal investigation. The statute clearly provides the right to DNA testing of biological material that was not previously subjected to DNA testing, was related to the criminal investigation, and is currently in actual or constructive possession of the State. K.S.A. 2004 Supp. 21-2512(a)." 34 Kan. App. 2d at 794.

This court determined that, as in *Bruner*, the defendant's allegations warranted the appointment of counsel and an evidentiary hearing. 34 Kan. App. 2d at 794.

In both *Bruner* and *Goldsmith*, the DNA evidence collected in those cases had not been found to be consistent with a particular individual's DNA. Thus, testing on the DNA evidence collected in both *Bruner* and *Goldsmith* could potentially reveal another suspect or even exonerate the defendant. Thus, under the facts of both *Bruner* and *Goldsmith*, the DNA samples were capable of producing noncumulative, exculpatory evidence relevant to the claims of the appellants that they were wrongly convicted or sentenced.

Here, however, the DNA testing on the biological evidence had revealed that Lackey's DNA was consistent with the sperm cells found in S.B.'s vagina and on the cutting from the underwear. There is nothing to suggest that the DNA testing was unreliable or produced an incorrect result. In fact, Burdett's testimony established that the estimated probability of selecting an individual at random from the general unrelated Caucasian population was 1 in 194 billion. Although Burdett testified that some of the DNA samples were "degradated" and "beginning to fall apart" because of the age of the samples, she was still able to obtain a DNA profile from certain of those samples and to determine that the DNA profile was consistent with Lackey's DNA.

In his appellate brief, Lackey challenges Burdett's testimony by arguing that the test set forth in *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), was never applied. The general acceptance test set forth in *Frye* governs the admissibility of expert scientific evidence in Kansas in those situations wherein such a test or standard is required. *State v. Isley*, 262 Kan. 281, Syl. ¶ 1, 936 P.2d 275 (1997).

Here, Burdett went into great detail describing the process she used in analyzing and testing DNA evidence. Burdett testified about the polymerase chain reaction (PCR) method that she used in testing DNA. After describing her testing procedures, Burdett testified that the FBI uses similar procedures and statistics. Burdett further testified that DNA typing had been accepted by Kansas courts.

Our Supreme Court has held that "[t]he DNA testing method known as the Polymerase Chain Reaction (PCR) method meets the general acceptance *Frye* test in Kansas." *Isley*, 262 Kan. 281, Syl. ¶ 2. Because our Supreme Court has specifically held that the particular DNA testing technique utilized by Burdett in this case meets the *Frye* test, Lackey's argument concerning the *Frye* test lacks merit.

In short, Lackey is unable to establish that the DNA samples collected in this case were capable of producing noncumulative, exculpatory evidence relevant to his claim that he was wrongly convicted of the premeditated murder and rape of S.B. We agree with this court's holding in *State v. Smith*, 34 Kan. App. 2d 368, 373, 119 P.3d 679, *rev. denied* 280 Kan. 990 (2005), that there is no requirement to appoint counsel and hold an evidentiary hearing where the files and records available to the trial court demonstrate conclusively that such DNA testing could not lead to exculpatory evidence. This holding reflects the legislature's intent as expressed in K.S.A. 21-2512(a) and (c). Before ordering DNA testing under K.S.A. 21-2512, the trial court must determine "that testing may produce noncumulative, exculpatory evidence relevant to the claim of the petitioner that the petitioner was wrongfully convicted or sentenced." K.S.A. 21-2512(c).

We recognize that in *Bruner*, our Supreme Court rejected the State's argument that the defendant's petition for DNA testing under K.S.A. 21-2512 should be denied because there was overwhelming evidence against him. Nevertheless, unlike the instant case, the circumstantial evidence against the defendant in *Bruner* had not been biological evidence. Moreover, our Supreme Court concluded that there was "no reason to believe that testing of available biological evidence might not produce noncumulative, exculpatory evidence." 277 Kan. at 606.

Here, the appellate record conclusively establishes that testing of the biological evidence could not produce noncumulative, exculpatory evidence. Under these circumstances, appointing counsel for Lackey and conducting an evidentiary hearing would have been a futile exercise. Because Lackey could not establish that he was entitled to DNA testing under K.S.A. 21-2512, the trial court properly denied his motion for DNA testing.

*II. Was the trial court required to notify the prosecutor of Lackey's motion for DNA testing?*

Finally, Lackey contends that the trial court erred in denying his motion for DNA testing by failing to notify the prosecutor of his motion, as required by K.S.A. 21-2512(b)(1). This same argument has been rejected by this court in *Smith*, 34 Kan. App. 2d at 374. As in *Smith*, we recognize that the record fails to establish that the trial court notified the prosecutor of Lackey's motion for DNA testing. The better practice would be for the trial court to comply with all the requirements of K.S.A. 21-2512 once a defendant has requested DNA testing under that statute. Nevertheless, given the trial court's proper determination that no testing was warranted, Lackey suffered no prejudice due to the lack of notification to the prosecutor.

In summary, we conclude that the files and records available to the trial court conclusively established that even if the additional DNA testing requested by Lackey were to be performed, it would

not produce exculpatory evidence. The trial court's decision denying Lackey's motion for DNA testing under K.S.A. 21-2512 is affirmed.

Affirmed.