MARY H. SHERIDAN, APPELLEE, V. CATERING MANAGEMENT, INC., DOING BUSINESS AS 1ST AVENUE BAR & GRILL, AND MILWAUKEE INSURANCE COMPANY, APPELLANTS.

558 N.W.2d 319

Filed January 7, 1997.    No. A-96-399.

Walter E. Zink II, of Baylor, Evnen, Curtiss, Grimit & Witt, for appellants.

Darrell K. Stock, of Snyder & Stock, for appellee.

MILLER-LERMAN, Chief Judge, and HANNON and IRWIN, Judges.

HANNON, Judge.

Catering Management, Inc., doing business as 1st Avenue Bar & Grill, and Milwaukee Insurance Company, appeal from

the judgment of the Workers' Compensation Court review panel, which affirmed the trial judge's finding that Mary H. Sheridan suffered brain damage as a result of exposure to pesticides arising out of and in the course of her employment with Catering Management. For the reasons set forth below, we affirm.

## FACTUAL BACKGROUND

Sheridan, age 33 at trial, worked as a bartender at the 1st Avenue Bar & Grill beginning in June 1993. As part of her duties, she normally staffed the bar by herself and ran the cash register. She also served as a cocktail waitress one night a week.

Sheridan worked the night of Saturday, September 18, 1993, and closed the bar at approximately 1 a.m. on Sunday, September 19. After the bar was closed, Larry Rezac, an exterminator, came to spray the premises for cockroaches, which he did on a monthly basis. There is evidence that Rezac had been coming more frequently in the months prior to September 19. Rezac applied his normal base spray application of a chemical called Conquer in the cracks and crevices while Sheridan and other employees remained in the bar. After everyone left, Rezac power-fogged the bar with a chemical called Prentox, a mixture of pyronyl oil and Conquer. Rezac also applied a powder chemical called Drione behind the walls. The chemicals consisted of esfenvalerate, pyrethrins, and synergists. Rezac finished at 4:30 a.m. and instructed all humans to remain away for 4 hours.

Dianna Kindler, who worked in the kitchen of the bar, arrived at 8:20 a.m. on September 19 and worked until 10:30 a.m., preparing food. Kindler testified that she did not notice any fog, did not have difficulty breathing, did not notice any unusual sensations, and did not experience any physical problems afterward.

Sheridan returned at noon to clean the bar before opening it to the public. She testified that the bar was "really foggy" and "smelled awful." Using towels and a bucket of water, she washed everything in the bar that had been exposed to the chemicals. Sheridan, whose hands and arms were uncovered, continually dunked the towels into the water and wrung them out. She cleaned for approximately 2½ hours, opened the bar,

and then worked until midnight. She testified that while working, she experienced headaches, burning in her eyes and throat, ringing in her ears, body aches, and a feeling of nauseousness. According to her testimony, the following day, her muscles felt paralyzed and extremely sore, she could hardly talk, she was experiencing seizures, and she was having problems with blurry vision. Her husband, Steven, took her to Lincoln General Hospital.

Since September 19, Sheridan has experienced problems with her memory, vision, patience, and temper, which problems have prevented her from working and have made it difficult for her to help around the house and with her children. She testified that she experiences hundreds of "shocks through [her] body" per day and that she itches herself until she bleeds. Her husband testified that she has temper "explosions." She brought suit against Catering Management on July 15, 1994, seeking workers' compensation benefits. Trial was held in March 1995, at which time a considerable amount of expert testimony was presented, the significant portion of which we summarize below.

Dr. Carol Angle, a physician, saw Sheridan first on September 29, 1993, and then again on April 6, 1994. Dr. Angle testified that Sheridan suffered from persistent cognitive and emotional dysfunction, which Dr. Angle described as organic brain damage. Dr. Angle opined, with a reasonable degree of medical certainty, that Sheridan's organic brain damage was due to toxic encephalopathy (organic brain disease) from acute poisoning by esfenvalerate (a synthetic pyrethroid and isomer of fenvalerate), other pyrethrins (natural products used as insecticides), their synergists, and petroleum distillates on September 19, 1993. According to Dr. Angle's calculations, Sheridan could have absorbed as much as 1 percent of the total amount of the chemicals applied to the bar. Dr. Angle also testified that absorption of as little as .1 percent would have been sufficient to produce symptomatic poisoning in Sheridan.

Dr. Angle also testified concerning the nature of the chemicals to which Sheridan was exposed. Dr. Angle admitted that while there were limited clinical reports of fenvalerate poisoning, where brain damage symptoms lasted up to 1 year, there were no human reports of esfenvalerate poisoning. However,

Dr. Angle testified that esfenvalerate had produced neurologic symptoms of staggering gait, tremors, and altered response to stimuli in rats and is three times as toxic as fenvalerate. Dr. Angle also testified that despite the fact that the pertinent literature suggested that those exposed to fenvalerate would be completely free of symptoms within 1 to 2 months, and certainly by 1 year, it was Dr. Angle's opinion that Sheridan had persistent symptoms and deficits and persistent evidence of organic brain damage. Dr. Angle added that it was certainly possible that pyrethrins and pyrethroids could cause neurologic injury.

Thomas Korn, Ph.D., a neuropsychologist and rehabilitation consultant with specialized training in the assessment and intervention of people with various kinds of brain injuries, examined Sheridan on October 5 and November 4, 1993, and January 13 and June 2, 1994. Korn opined, with a reasonable degree of medical certainty, that she sustained an encephalopathy as a consequence of her exposure to chemical pesticides, which resulted in deficits in her brain functioning. Korn testified that her emotional situation, depression, anxiety, and "catastrophic responding" were consequential to her encephalopathy. Korn further testified that the deficits were chronic, or permanent, in nature and that resultingly, she was not a candidate for continuous, competitive, or even part-time employment.

Dr. Richard Andrews, a neurologist who had treated other individuals with a history of toxic exposure, examined Sheridan on December 20, 1993. Dr. Andrews testified that based on "the best of my ability to tell and to the best degree of medical certainty that I can come to," she suffered a brain injury which was directly related to a toxic exposure that she suffered when she was exposed to pesticides and rodenticides in the course of her job. Dr. Andrews concluded that her injury was permanent and that she would be unable to sustain competitive employment.

Dr. Sharon Hammer, a psychiatrist, began seeing Sheridan on January 25, 1994. Dr. Hammer also opined, based on a reasonable degree of medical certainty, that Sheridan had an organic brain disorder, or an organic mood disorder, and would continue exhibiting problems with memory dysfunction, psychiatric sequela (modulation of emotional responses), depression, and

anxiety. Dr. Hammer testified that Sheridan's symptoms would be permanent.

Bart Hultine, a vocational specialist and rehabilitation economist, concluded in his report that Sheridan's loss of earning capacity due to her exposure to pesticides was 100 percent.

Dr. Eli Chesen, a psychiatrist, examined and tested Sheridan on January 25, 1995. Dr. Chesen opined, with a reasonable degree of medical certainty, that she showed no evidence of intellectual or memory dysfunction, no evidence of psychiatric or neurological injury, no evidence of organic brain damage or encephalopathy, and no evidence of any vocational limitations or restrictions. Dr. Chesen further concluded that she dramatically exaggerated her memory difficulties and vision problems and was "actively manipulating her answers to questions so as to show that her memory was malfunctioning . . . ." Dr. Chesen testified: "It's my belief that for reasons of both primary and secondary gain that she was attempting to look damaged to me as an examiner."

Dr. Joel Cotton, a neurologist, examined Sheridan on February 2, 1995, and concluded that she had not suffered any physical injury to her nervous system or to her brain caused by a toxic exposure. Dr. Cotton further concluded that she was capable of performing all usual, customary activity without restrictions.

Dr. Ronald Gots of the National Medical Advisory Service, Inc., in an August 30, 1994, report based on a review of Sheridan's medical records, concluded:

> It is toxicologically incorrect to assert that Ms. Sheridan's problems are related to pesticide toxicity. First of all, the agents used have very minimal toxicity. The primary agent, Prentox, consists primarily of a pyrethrin, a class of pesticides derived from chrysanthemums. The only reported cases of poisoning by this (other than children drinking it) occurred in Chinese workers who were directly and heavily sprayed. All recovered. Millions of workers and homeowners are exposed directly to applications of these pesticides with no adverse effects. Furthermore, there is no way, given the alleged exposure, for Ms. Sheridan to have had any systemic exposure. For

toxicity to occur, a dose must enter the body. This can theoretically occur by drinking the chemical or inhaling a concentrated airborne mixture. Dried residue at the bar could not have entered her body.

Next, Ms. Sheridan had signs of anxiety but no other physical findings or laboratory findings in the days after the alleged event. She clearly was not poisoned.

Lastly, the recent diagnosis of toxic encephalopathy is readily explained by her alcoholism, the most common cause of toxic encephalopathy.

Joel Coats, Ph.D., a professor of entomology and toxicology at Iowa State University, reported that Sheridan tested negative for the presence of esfenvalerate. Coats, who had no opinion as to her susceptibility to chemicals, additionally reported that he calculated her exposure to the chemicals to be 10 times less than Dr. Angle's calculation.

Coats explained that while fenvalerate has been used for approximately 15 years as a pesticide, esfenvalerate is a relatively new chemical. Esfenvalerate and natural pyrethrins are known to affect sodium channels in the nerve, thus creating ionic imbalance. Coats testified that the relevant literature shows that the most common symptoms in humans from exposure to pyrethrins and pyrethroids are itching, burning, and tingling sensations in exposed features of the body and that the normal length of symptoms could last up to a few days. Coats further testified that based primarily upon medical literature, there was no evidence that esfenvalerate or natural pyrethrins or other synthetic pyrethroids caused permanent brain damage or permanent ill effects in humans. Coats, however, admitted that he did not distinguish between esfenvalerate and fenvalerate in forming his opinions, despite the fact that esfenvalerate was three times more toxic. Coats also admitted that it was possible that there was no literature concerning esfenvalerate and its effect on humans, that all the effects of esfenvalerate on humans were not known to science, that science could not completely predict its effects, and that he could not guarantee that there were no permanent effects from such an exposure. Coats testified that a large enough dose of esfenvalerate could be lethal.

The trial judge found that on September 19, 1993, Sheridan suffered brain damage as a result of exposure to pesticides arising out of and in the course of her employment. The trial judge further found that she was temporarily totally disabled from September 20, 1993, to and including June 2, 1994, and thereafter became permanently totally disabled. The review panel affirmed the judgment.

## ASSIGNMENTS OF ERROR

Catering Management and Milwaukee Insurance assign five errors; however, not all of them were discussed in their brief. We do not address those errors assigned, but not discussed. *Scott v. Pepsi Cola Co.*, 249 Neb. 60, 541 N.W.2d 49 (1995). Catering Management and Milwaukee Insurance's entire argument is that the trial judge erred in admitting expert testimony, specifically, the deposition testimony and opinions of Dr. Angle on the issue of causation without a showing that the testimony was generally accepted within the relevant scientific community.

## STANDARD OF REVIEW

■ Pursuant to Neb. Rev. Stat. § 48-185 (Reissue 1993), an appellate court may modify, reverse, or set aside a Workers' Compensation Court decision only when (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. *Kerkman v. Weidner Williams Roofing Co.*, 250 Neb. 70, 547 N.W.2d 152 (1996); *Cords v. City of Lincoln*, 249 Neb. 748, 545 N.W.2d 112 (1996). In determining whether to affirm, modify, reverse, or set aside the judgment of the Workers' Compensation Court review panel, a higher appellate court reviews the findings of the single judge who conducted the original hearing. *Haney v. Aaron Ferer & Sons*, 3 Neb. App. 14, 521 N.W.2d 77 (1994).

■ Findings of fact made by the Workers' Compensation Court after review have the same force and effect as a jury verdict and will not be set aside unless clearly erroneous. *Kerkman*

*v. Weidner Williams Roofing Co., supra; Cords v. City of Lincoln, supra.* In testing the sufficiency of the evidence to support findings of fact made by the Workers' Compensation Court, the evidence must be considered in the light most favorable to the successful party. *Kerkman v. Weidner Williams Roofing Co., supra; Cords v. City of Lincoln, supra.* As the trier of fact, the Workers' Compensation Court is the sole judge of the credibility of the witnesses and the weight to be given their testimony. *Kerkman v. Weidner Williams Roofing Co., supra.*

▮ An appellate court is obligated in workers' compensation cases to make its own determinations as to questions of law. *Berggren v. Grand Island Accessories*, 249 Neb. 789, 545 N.W.2d 727 (1996).

## ANALYSIS

▮ To recover compensation benefits, an injured worker is required to prove by competent medical testimony a causal connection "between the alleged injury, the employment, and the disability." *Schlup v. Auburn Needleworks*, 239 Neb. 854, 863, 479 N.W.2d 440, 447 (1992). The injured worker must show by a preponderance of the evidence that the employment proximately caused an injury which resulted in disability compensable under the Workers' Compensation Act. *Id.* Unless its nature and effect are plainly apparent, an injury is a subjective condition requiring an expert opinion to establish a causal relationship between the incident and the injury or disability. *Bernhardt v. County of Scotts Bluff*, 240 Neb. 423, 482 N.W.2d 262 (1992).

Catering Management and Milwaukee Insurance claim that only two witnesses, Coats and Dr. Angle, possessed sufficient knowledge of toxicology to render an opinion on causation. Catering Management and Milwaukee Insurance argue that because Dr. Angle failed to demonstrate that the chemicals could have caused Sheridan's injury (and Coats dismissed the possibility of causation), Dr. Angle's opinions establishing causation should not have been admitted. As the main thrust of its argument, Catering Management and Milwaukee Insurance ask this court to apply the "general acceptance" test for the admissibility of novel scientific evidence as set forth in *Frye v. United*

*States*, 293 F. 1013, 1014 (D.C. Cir. 1923) (lie detector test ruled inadmissible).

Neb. Evid. R. 702, Neb. Rev. Stat. § 27-702 (Reissue 1995), provides:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Nebraska has adopted the *Frye* test and not the arguably more flexible standard in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). See, *Anderson/Couvillon v. Nebraska Dept. of Soc. Servs.*, 248 Neb. 651, 538 N.W.2d 732 (1995); *State v. Carter*, 246 Neb. 953, 524 N.W.2d 763 (1994); *State v. Dean*, 246 Neb. 869, 523 N.W.2d 681 (1994), *cert. denied* 515 U.S. 1123, 115 S. Ct. 2279, 132 L. Ed. 2d 282 (1995). Under the test or standard enunciated in *Frye*, reliability for admissibility of an expert's testimony, including an opinion, which is based on a scientific principle or is based on a technique or process which utilizes or applies a scientific principle, depends on general acceptance of the principle, technique, or process in the relevant scientific community. *Anderson/Couvillon v. Nebraska Dept. of Soc. Servs., supra*; *State v. Dean, supra*; *State v. Reynolds*, 235 Neb. 662, 457 N.W.2d 405 (1990); *State v. Tlamka*, 1 Neb. App. 612, 511 N.W.2d 135 (1993), *affirmed* 244 Neb. 670, 508 N.W.2d 846. *Frye* is the appropriate test to use in determining the admissibility of novel scientific evidence. *State v. Carter, supra.* One benefit of *Frye* is that it protects courts from unproven and potentially erroneous scientific theories until those theories have been appropriately subjected to scrutiny by experts from the relevant scientific community. *State v. Carter, supra.*

"In effect, *Frye* envisions an evolutionary process leading to the admissibility of scientific evidence. A novel technique must pass through an 'experimental' stage in which it is scrutinized by the scientific community. Only after the technique has been tested successfully in this

stage and has passed into the 'demonstrable' stage will it receive judicial recognition."

*State v. Carter*, 246 Neb. at 973-74, 524 N.W.2d at 778 (quoting Paul C. Giannelli, *The Admissibility of Novel Scientific Evidence: Frye v. United States, a Half-Century Later*, 80 Colum. L. Rev. 1197 (1980)).

The *Frye* test has been applied in Nebraska to lost enjoyment of life calculations, DNA statistical probability calculations, laser bullet-trajectory analysis, and psychological testing methodology. See, *Anderson/Couvillon v. Nebraska Dept. of Soc. Servs., supra*; *State v. Carter, supra*; *State v. Dean, supra*; *State v. Houser*, 241 Neb. 525, 490 N.W.2d 168 (1992); *State v. Tlamka, supra* (methodology used by doctor to arrive at his opinion did not have evidential underpinning of acceptance in relevant scientific community as to who has and has not previously engaged in prior acts of sexual abuse upon child). See, also, *State v. Patterson*, 213 Neb. 686, 331 N.W.2d 500 (1983) (quoting Arizona court's use of *Frye* test with regard to hypnosis); *Boeche v. State*, 151 Neb. 368, 37 N.W.2d 593 (1949) (where court cited *Frye* in holding that use of polygraph had not yet received general scientific acceptance).

When applied to the admission of particular expert testimony, the *Frye* standard of "general acceptance within a particular scientific field" has been employed as a special foundational requirement for *novel* or new scientific devices or processes involving the evaluation of physical evidence, such as lie detectors, experimental systems of blood typing, voiceprints, identification of human bite marks, microscopic analysis of gun residue and human leukocyte antigen testing.

*City of Aurora v. Vaughn*, 824 P.2d 825, 826 (Colo. App. 1991). The *Vaughn* court held that the *Frye* test is inapplicable where there is no claim that a novel or newly developed scientific device or process is utilized by a physician in the test under consideration.

While the *Frye* test has never specifically been applied in a workers' compensation case in Nebraska, it has been addressed by workers' compensation courts in other states, including recently in *Armstrong v. City of Wichita*, 21 Kan. App. 2d 750,

907 P.2d 923 (1995). In *Armstrong*, the claimant-employee was similarly exposed to toxic chemicals, and one of the claimant's physicians diagnosed the claimant with multiple chemical sensitivities. The administrative law judge found the requisite causation and allowed the claimant to recover. The employer argued that the physician's opinion, treatment, and diagnosis did not pass the *Daubert* test and was therefore inadmissible.

██ The *Armstrong* court held that in a workers' compensation case involving occupational disease, a claimant is not required to prove that the treating physician's opinions, diagnosis, or treatment satisfies either the *Daubert* or the *Frye* test. The court reasoned:

> A claimant's burden of proof in a workers compensation case is to prove that it is more probably true than not true that he or she suffers from a disabling physical condition which is the result of his or her work. To require a claimant to also prove that a diagnosis is one universally recognized by and agreed upon in the medical community is above and beyond the scope and nature of the Workers Compensation Act. To apply the *Daubert* or the *Frye* standard to a workers compensation case would be to apply technical rules of procedure to which neither the ALJ nor the Board are subject. It also would require us to apply our rules of evidence to those proceedings, and those rules of evidence have been held specifically not applicable.

*Armstrong v. City of Wichita*, 21 Kan. App. 2d at 758, 907 P.2d at 929. We agree. We do, however, note that in Kansas, medical testimony is not essential to the establishment of the existence, nature, and extent of the disability of an injured worker.

██ In *Fuyat v. Los Alamos Nat. Laboratory*, 112 N.M. 102, 811 P.2d 1313 (N.M. App. 1991), the claimant-employee was exposed to aqua regia fumes. At trial, experts were split as to whether the claimant's symptoms were triggered by exposure to chemicals at work. The employer argued that expert opinions establishing causation were inadmissible because they were based upon novel scientific techniques that had not gained general acceptance. The *Fuyat* court held that a licensed physician who had examined and treated the claimant and who had past experience with patients suffering from the same types of symp-

toms was qualified to give an expert opinion about the claimant's symptoms and that such testimony did not have to meet the requirements of *Frye*.

We recognize that the *Frye* test has been applied to workers' compensation cases dealing with serum blood alcohol tests, see *Domino's Pizza v. Gibson*, 668 So. 2d 593 (Fla. 1996), and infrared thermography, see *K-Mart Corp. v. Morrison*, 609 N.E.2d 17 (Ind. App. 1993). See, also, *Garcia v. Borden, Inc.*, 115 N.M. 486, 853 P.2d 737 (N.M. App. 1993) (dissent not advocating *Frye* test or suggesting that court should be bound by majority view of medical profession or of any other scientific group on issue of causation).

In Nebraska, the Workers' Compensation Court is not bound by the usual common-law or statutory rules of evidence, and admission of evidence is within the discretion of the Workers' Compensation Court, whose determination in this regard will not be reversed upon appeal absent an abuse of discretion. *Paulsen v. State*, 249 Neb. 112, 541 N.W.2d 636 (1996). Regarding the use of evidence based on the opinion of a medical expert, the witness must qualify as an expert, the witness' testimony must assist the trier of fact to understand the evidence or determine a fact in issue, the witness must have a factual basis for the opinion, and the testimony must be relevant. *Id.*

Dr. Angle, a licensed physician, had not only examined and treated Sheridan, but was familiar with the symptoms of and literature on such chemical exposures. Dr. Angle testified, based on her knowledge of the relevant scientific literature, that (1) symptoms from fenvalerate poisoning could potentially last up to 1 year; (2) esfenvalerate has produced neurologic symptoms in rats of staggering gait, tremors, and altered response to stimuli; and (3) esfenvalerate is three times as toxic as fenvalerate. Based on these factors, Dr. Angle opined with a reasonable degree of medical certainty that Sheridan's exposure to the toxic chemicals caused her organic brain injury. We find nothing novel in such a diagnosis. Furthermore, we agree with the court in *Armstrong v. City of Wichita*, 21 Kan. App. 2d 750, 907 P.2d 923 (1995), that a claimant is not required to prove that a diagnosis is universally recognized by and agreed upon in the medical community. Such a requirement would impose an oner-

ous burden upon the claimant in the context of workers' compensation litigation. We cannot say that the trial court abused its discretion in admitting the testimony and opinions of Dr. Angle. Dr. Angle was qualified to give an opinion as to the causation of Sheridan's symptoms.

Even without Dr. Angle's testimony, there is sufficient unchallenged evidence, viewed in the light most favorable to Sheridan, to support the trial judge's finding that she proved by a preponderance of the evidence causation between her employment and her injury or disability. Dr. Andrews, Dr. Hammer, and Korn all testified with a reasonable degree of medical certainty that Sheridan sustained a brain injury as a consequence of her exposure to the chemicals on September 19, 1993. We acknowledge the conflicting expert testimony to the effect that Sheridan did not suffer any physical injury and was fabricating her symptoms. However, under *Berggren v. Grand Island Accessories*, 249 Neb. 789, 545 N.W.2d 727 (1996), the compensation court is free to believe whichever experts it chooses. Triers of fact, including the Workers' Compensation Court, are not required to take the opinions of expert witnesses as binding, *Aken v. Nebraska Methodist Hosp.*, 245 Neb. 161, 511 N.W.2d 762 (1994), and may, as may any other trier of fact, either accept or reject such opinions, *Brandt v. Leon Plastics, Inc.*, 240 Neb. 517, 483 N.W.2d 523 (1992). It is for the Workers' Compensation Court to determine which, if any, of the expert witnesses to believe. *Berggren v. Grand Island Accessories, supra.* Having viewed the evidence in the light most favorable to Sheridan, we cannot say that the trial judge was clearly wrong in finding that she met her burden of proof on the issue of causation.

## CONCLUSION

The judgment of the Workers' Compensation Court trial judge, as affirmed by the Workers' Compensation Court review panel, is affirmed. We award Sheridan $1,750 in attorney fees.

AFFIRMED.