ROGER D. ELEDGE AND BARBARA ELEDGE, HUSBAND AND WIFE, APPELLANTS, V. FARMERS MUTUAL HOME INSURANCE COMPANY OF HOOPER, NEBRASKA, APPELLEE.

571 N.W. 2d 105

Filed November 10, 1997.    No. A-96-465.

T.J. Hallinan, of Cobb & Hallinan, P.C., for appellants.

Charles H. Wagner and Maureen Freeman-Caddy, of Edstrom, Bromm, Lindahl, Wagner & Miller, for appellee.

MILLER-LERMAN, Chief Judge, and SIEVERS and MUES, Judges.

MUES, Judge.

## INTRODUCTION

Roger D. Eledge and Barbara Eledge appeal from an order of the Butler County District Court awarding them $1,000 under their homeowner's insurance policy with Farmers Mutual Home Insurance Company (Farmers). The Eledges sought recovery of

$6,331 for damage to the roof and interior ceilings of their home allegedly resulting from a hailstorm or series of hailstorms occurring in May 1991. The trial court awarded them $1,000 for roof damage only. The Eledges appeal the sufficiency of that award, the failure to award ceiling damages, and the denial of attorney fees. Because we conclude that the trial court's findings concerning the damage to the roof and its finding that the hail damage did not cause damage to the interior ceilings are not clearly erroneous, we affirm the district court's order in those particulars. We reverse the denial of attorney fees and remand the cause for further proceedings in that regard.

## FACTUAL BACKGROUND

In 1980, the Eledges purchased a home at 510 C Street in Ulysses, Nebraska, for $7,000. Over the next 2 years, they spent approximately $30,000 renovating the home so that they could move into it. These repairs included putting new ceilings and walls in the second floor bedrooms, fixing a basement wall, and replacing the furnaces. The Eledges did not make repairs to the roof because the seller told them the roof was new and also because no repairs appeared to be necessary. After all the renovations were completed, the Eledges moved into the house in 1982.

In August 1990, the Eledges applied for homeowner's insurance with Farmers through its agent, Terry Kirby. They requested, received, and paid for a replacement cost policy on their home. To qualify for such policy, they had to insure their home for at least 80 percent of its actual replacement cost. Kirby helped the Eledges determine this amount to be $73,000, and the Eledges were issued an "Elite 3" policy from Farmers. The clause in issue reads as follows:

3. **Loss Settlement**. Covered property losses are settled as follows:

. . . .

b. Buildings under Coverage A [the dwelling] or B [other structures] at replacement cost without deduction for depreciation, subject to the following:

(1) If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full

replacement cost of the building immediately before the loss, *we will pay the cost to repair or replace*, after application of deductible and without deduction for depreciation, but not more than the least of the following amounts:

(a) the limit of liability under this policy that applies to the building;

(b) *the replacement cost of that part of the building damaged for like construction and use* on the same premises; or

(c) the necessary amount actually spent to repair or replace the damaged building.

(Emphasis supplied.)

After hailstorms in May 1991, the Eledges noticed that their roof was leaking around the chimney. They asked their friend and neighbor, Gary Davis, a roofer employed by American Roofing with 10 to 12 years of experience, to repair the damage. Davis installed new flashing around the chimney and replaced a few shingles immediately around the chimney. While he was on the roof, he noticed what was, in his opinion, hail damage across the entire roof, and suggested that the Eledges contact their insurance agent about the damage. After inspecting the interior of their home and discovering water damage on several of the second floor ceilings, the Eledges contacted Farmers through its agent, Terri Novak, and were told to get estimates to repair the damage.

The Eledges again contacted Davis and asked him for an estimate to repair the roof and the ceilings. Davis measured the roof and took pictures of some of the damaged areas. Mike McNair, American Roofing's estimator, then estimated the cost to replace the roof at $5,170. This estimate included tearing off the old layers of shingles that were on the roof and installing new felt, edge metals, flashing on the plumbing pipes, and asphalt shingles. Davis testified that the only workmanlike way to repair the hail damage and ensure that the roof would not continue to leak was to tear off the old shingles and replace the edge metals, felt, flashing, and shingles with new materials. Because there were already two layers of shingles on the roof, at least one of which had been damaged by hail, he testified that it would not be good workmanlike procedure to overlay the roof

with a third layer of shingles. Davis also testified that it was possible to simply tear out and replace the damaged shingles, but that he did not feel this was an adequate way to repair the Eledges' roof because those shingles would be a different color than the old shingles and he would not be able to guarantee a proper seal.

Davis also inspected the water damage to the interior ceilings shortly after the storms in May 1991. He testified that some of the stains looked fresh and some looked older, but he could not be certain how long any of them had been there. Davis also testified that he could not tell where the water was entering the house and concluded that it could be an entirely different point from where the ceiling was stained. He admitted that it was possible that all of the water damage originated from the chimney leak. Davis further testified that in his opinion the chimney leak was not caused by hail, and he could not say for sure that the hail damage to the roof caused the roof to leak, but in his opinion the damage was sufficient to cause leaking. The Eledges testified that after Davis fixed the chimney leak, it stopped leaking in that area, but the upstairs ceiling continued to suffer water damage in other areas. American Roofing estimated the cost to fix the water damage to the interior ceilings to be $1,161.

McNair testified that the estimates reflected the fair and reasonable cost to repair the hail and water damage and that each item on the estimates was necessary to make the repairs in a proper, workmanlike manner. Based upon these estimates, the Eledges submitted a proof of loss statement to Farmers in the amount of $6,231 ($6,331 less the $100 deductible).

Farmers contacted Midlands Claim Service and asked that an adjuster be sent to the Eledges' home to adjust the loss. Adjuster Jack Young was sent. Young is a teacher who had adjusted claims for damage caused by summer storms for approximately 8 years before he inspected the Eledges' roof. Young had also done some construction work, including a little roofing during his college years and during the summers. He received on-the-job training for adjusting storm damage by riding along with his boss during his first summer as an adjuster.

Young inspected the roof in June 1991 by climbing onto the roof and counting the hail-damaged spots or "hits" per 10- by

10-foot square. He found some hail damage across the entire roof, but after counting only three to four hits per square, he concluded that there was insufficient damage to replace the entire roof. This was based on an industry custom or standard that 10 hits per square would normally entitle the insureds to have their entire roof replaced. The basis for this standard was not explained. Young determined that it would take 29 squares of shingles to cover the entire roof. Because the damage was minor, he adjusted the claim by allowing a 33-percent damage allowance. In 1991, it cost approximately $65 per square to replace a roof; thus, Young took $65 times 33 percent and allowed $22 per square to repair the Eledges' roof. This allowed $638 for roof repair. According to Young, his estimate did not allow for the old shingle layers to be torn off and replaced; rather, his estimate was based upon the cost to tear out and replace only the shingles that were damaged by the hail. Young also inspected the interior ceilings and allowed $444 to repair that damage. His complete repair estimate, including the roof and the interior ceilings, was for $982 ($1,082 less the $100 deductible).

Based upon Young's investigation, Farmers offered to pay the Eledges $982 for the hail damage. They rejected the offer. After the Eledges' rejection, Leland Belcher, Young's boss, then did a reinspection to make sure Young was correct in his assessment of the damage and in his offer. In Belcher's opinion, only one slope of the roof had received any hail damage; thus, he felt that it was necessary to repair only that one damaged slope. Belcher did not feel that the hail damage had affected the whole roof and observed that the roof was old and had substantial deterioration prior to the hailstorm. He conceded that "wear and tear" was another term for depreciation. Thus, he admitted that the most appropriate way to repair the damaged slope would be to tear off at least one layer of shingles and put down a new layer on the entire slope, a process which he testified Young's $638 estimate would cover.

Approximately 2 years after the damage was reported, Farmers contacted James Belina, an engineer who specializes in analyzing structural failure due to storm damage. Belina inspected the Eledges' roof in July 1993 and took photographs

of the roof. In his testimony, prior to Belina's, Davis was shown these 1993 photographs taken by Belina and agreed that the roof was in essentially the same condition at the time of Belina's 1993 inspection as it was when Davis inspected it in 1991. Belina found that the roof was at the end of its useful life and found no evidence of hail damage. He found no craters or dents, which were characteristic of hail damage, in the roof or the flashing. In fact, he stated that he found nothing on the roof that was characteristic of hail damage. However, he admitted that he deviated from standard industry procedure in inspecting the roof in that he did not get onto the roof and examine each slope; instead, he used a telephoto lens and binoculars to examine parts of the roof. Belina had never been a roofer and conceded that an inspection for hail damage should occur as soon after the damage as is possible. He also testified that he had been told by Midlands Claim Service that an inspection in June 1991 had revealed no hail damage.

During trial, Roger Eledge testified that he assumed the damage occurred during two hailstorms in May 1991 because it was shortly after these storms that he noticed a leak around the chimney. He testified that the Eledges had no problems with the roof before May 1991, but had continually had problems since that time because the roof had not been fixed. Prior to trial, Farmers offered to settle the Eledges' claim for $1,100. This offer was also rejected, and trial was held to the court. The trial court found in favor of the Eledges in the amount of $1,000 for damages to the roof and taxed costs of $399.85 to Farmers, rejecting Farmers' defense that the Eledges did not have adequate replacement value coverage. The court further found that the leakage around the chimney was not caused by hail and that there was insufficient evidence to prove the interior damage was caused by the hailstorms. The court denied the Eledges attorney fees because the Eledges had failed to recover more than the amount offered by Farmers to settle the claim prior to trial. The Eledges timely appeal.

## ASSIGNMENTS OF ERROR

The Eledges allege that the trial court erred in (1) awarding them $1,000 to repair the roof when the only competent evidence shows that the fair and reasonable cost to repair/replace

the roof in a workmanlike manner was $5,170; (2) failing to find that the water damage to the interior ceilings was caused by the hail damage to the roof; and (3) failing to award attorney fees pursuant to Neb. Rev. Stat. § 44-359 (Reissue 1993).

## STANDARD OF REVIEW

■ The interpretation and construction of an insurance contract ordinarily involve questions of law in connection with which an appellate court has an obligation to reach conclusions independent of the determinations made by the court below. *Luedke v. United Fire & Cas. Co.*, 252 Neb. 182, 561 N.W.2d 206 (1997); *Kast v. American-Amicable Life Ins. Co.*, 251 Neb. 698, 559 N.W.2d 460 (1997); *Burke v. Blue Cross Blue Shield*, 251 Neb. 607, 558 N.W.2d 577 (1997).

■ In reviewing a judgment awarded in a bench trial, an appellate court does not reweigh the evidence, but considers the judgment in a light most favorable to the successful party and resolves evidentiary conflicts in favor of the successful party, who is entitled to every reasonable inference deducible from the evidence. *Sherrod v. State*, 251 Neb. 355, 557 N.W.2d 634 (1997).

■ On appeal, the fact finder's determination of damages is given great deference. *Nichols v. Busse*, 243 Neb. 811, 503 N.W.2d 173 (1993). The amount of damages to be awarded is a determination solely for the fact finder, and its action in this respect will not be disturbed on appeal if it is supported by evidence and bears a reasonable relationship to the elements of the damages proved. *World Radio Labs. v. Coopers & Lybrand*, 251 Neb. 261, 557 N.W.2d 1 (1996).

## DISCUSSION

*Roof Damage.*

The Eledges' first assignment of error is that the award of $1,000 for hail damage to the roof was insufficient. They contend that the policy obligated Farmers to pay the reasonable cost necessary to replace their entire roof. Their evidence was that this amount was $5,170. Farmers argues that the policy entitles the Eledges only to sums necessary to repair or replace the part of the house damaged by hail—in this case, portions of the roof and individual shingles. The pertinent portion of the policy reads as follows:

(1) . . . [W]e will pay the cost to repair or replace, after application of deductible and without deduction for depreciation, but not more than the least of the following amounts:

. . . .

(b) *the replacement cost of that part of the building damaged for like construction and use* on the same premises . . . .

(Emphasis supplied.)

■ The interpretation and construction of an insurance contract ordinarily involve questions of law in connection with which an appellate court has an obligation to reach conclusions independent of the determinations made by the court below. *Luedke v. United Fire & Cas. Co., supra.* In interpreting an insurance contract, the court construes the policy as any other contract, giving effect to the parties' intentions at the time the contract was made. Where the terms of such contract are clear, they are to be accorded their plain and ordinary meaning. *Burke v. Blue Cross Blue Shield, supra.*

The Eledges argue, somewhat inconsistently, that the policy is ambiguous and also that the plain and ordinary meaning of the "replacement cost" provision compels their recovering the cost of replacing the entire roof in this case. We do not agree that the "plain and ordinary meaning" of this policy provision compels replacing the entire roof in every instance where hail damages only a part of the roof. For example, where a single square of shingles is damaged and matching replacements can be found, and where the repair can be made without damage to the remainder of the roof, such interpretation would mean that an insured was nevertheless entitled to the cost of replacing the whole roof as a matter of law. We do not believe a reasonable person would place such an interpretation on this policy. A plain reading of the provision does not require the replacement of the whole when it is factually shown that the whole can be satisfactorily repaired by replacement of a "part," so long as the building is returned to "like construction and use" as a result. The policy language obligates Farmers to pay the reasonable cost to repair or replace, but no more than the replacement cost of that "part of the building damaged." No deduction may be

taken for depreciation of the part damaged by the covered occurrence. Moreover, as a matter of law, we find no ambiguity as to what "replacement cost" means under the policy.

In reality, we believe the Eledges recognize that the result here does not depend so much on contract interpretation as it does on the facts. In essence, their argument is that the evidence shows that the only workmanlike way to repair the hail damage would be to replace the entire roof.

An appellate court, in reviewing a judgment of the district court for errors appearing on the record, will not substitute its factual findings for those of the district court where competent evidence supports those findings. *Records v. Christensen*, 246 Neb. 912, 524 N.W.2d 757 (1994).

The district court made no specific findings regarding the hail damage to the roof. However, several such findings are implicit in its award; first and foremost, that the May 1991 hailstorm caused damage of some kind to the Eledges' roof, obviously less than Davis opined, but more than attested to by Belina, who found none. Proximate cause is a question of fact to be determined by the trial court as fact finder, and will not be disturbed on appeal unless clearly wrong. See *Bean v. State*, 222 Neb. 202, 382 N.W.2d 360 (1986).

Considering the evidence in a light most favorable to Farmers, as we must, Farmers' adjuster Belcher attested that only one slope of the roof sustained minor hail damage, and Farmers' expert, Belina, testified that the roof was badly deteriorated due to its age. While we agree that under the policy the age and deteriorated condition of the Eledges' roof does not itself preclude replacing the whole roof, it does have a bearing on the issue of causation. In other words, while the policy clearly prohibits any "deduction for depreciation," the damage must result from a covered occurrence—here, the hail. Damage caused from normal wear and tear or depreciation is obviously not covered.

As stated, the trial court obviously rejected the testimony of both Davis and Belina, and this it was free to do. A trial court, as the trier of fact, is the sole judge of credibility of the witnesses and the weight to be given their testimony. *Sherrod v. State*, 251 Neb. 355, 557 N.W.2d 634 (1997). A fact finder is

free to reject the opinion of experts and to choose which witness to believe. See *Sheridan v. Catering Mgmt., Inc.*, 5 Neb. App. 305, 558 N.W.2d 319 (1997).

The district court also implicitly found that a reasonable and workmanlike method to repair the hail damage was to replace only a part of the roof. The Eledges contend that this finding was clearly erroneous because Davis, the only roofer called as a witness, testified that the only workmanlike method to repair the hail damage to the Eledges' roof, and to guarantee that it would not continue to leak, was to tear off the existing shingles down to the subdecking or plywood underneath, and then replace the felt, edge metals, flashing, and shingles with new materials. Davis testified that tearing out and replacing only the damaged shingles was possible, but he could not guarantee a leak-free roof if repaired in such manner. Moreover, the new individual shingles would not match the older ones.

It is true that the policy requires that the repair or replacement must be sufficient for "like construction and use." In other words, the repair must return the structure as nearly as possible to its predamage condition, and no deduction can be taken for depreciation. This plainly requires that if hail damage causes roof leaks, the method of repair must include eliminating these leaks. But a "replacement cost" policy does not, in every case, entitle the insured to a guarantee of a "leak-free" roof. If the roof leaked *before* any hail damage, and if the method to repair the area damaged can otherwise be done in a workmanlike manner, including its being made "leak-free," that the roof might continue to leak from a non-hail-damaged area does not render that method unworkmanlike.

It is implicit in the award below that the district court found that the roof, which, according to witnesses, was 15 to 20 years old and near the end of its useful life and had defective chimney flashing, leaked for reasons unrelated to the hail damage. Davis testified that the chimney leak was unrelated to the hailstorm and that some of the ceiling waterstains, whatever their source, looked "older."

The Eledges cite *Higginbotham v. New Hampshire Indem. Co.*, 498 So. 2d 1149 (La. App. 1986), as authority for the position that they were entitled to the replacement cost of a new roof

rather than to the cost of repairing the roof as allowed. *Higginbotham* is, in many respects, similar to the case here. The trial court found that the amounts tendered by the insurer were sufficient to repair the hail damage. The appellate court amended the trial court's award, finding "manifest error," *id.* at 1151, in the trial court's factual conclusions. The appellate court found that the replacement cost of a new roof was the proper method of valuation based on the evidence presented. In so doing, it relied heavily on the undisputed evidence that spot replacement, while possible, would not guarantee a leak-free roof. The *Higginbotham* court stated: "The testimony of all experts revealed that the proper standard of repair . . . would be to remove and replace the roof." *Id.* at 1153. As here, the main dispute was whether the roof could be repaired or whether the severity of the damage was such that replacement was necessary. There, all experts testified that to guarantee a leak-free roof, the entire roof needed to be replaced. The opinion is silent on predamage leaks.

We believe that the facts in *Higginbotham* make it distinguishable from the case before us. Here, both Young and Belcher testified to repair methods other than replacing the roof. While Young's estimate was based on spot-replacing shingles, Belcher testified that the most appropriate way to fix the damaged area was to tear off the top layer of shingles on the damaged slope and replace it with a new layer, a method which he attested could be accomplished at a cost within Young's estimate of $638. This alternative method took into account the insurance department directive that a third layer not be placed over two or more existing layers and eliminated spot replacement of individual shingles and the leakage and "mismatch" problems that spot replacement would cause according to Davis. Here, unlike in *Higginbotham*, all the experts did not agree on the type or degree of repair necessary to correct the hail damage.

In an action tried to the court, the factual findings of the court will not be disturbed on appeal unless clearly wrong. *Bachman v. Easy Parking of America*, 252 Neb. 325, 562 N.W.2d 369 (1997). An appellate court, in reviewing a judgment of the district court for errors appearing on the record, will not substitute

its factual findings for those of the district court where competent evidence supports those findings. *Records v. Christensen*, 246 Neb. 912, 524 N.W.2d 757 (1994). The trial court's implicit finding that the proper standard of repair in this case did not require replacing the whole roof is not clearly erroneous.

The court's award of $1,000 was almost 50 percent higher than the roof damage figure of $638 attested to by Young and Belcher. There is nothing to suggest that the trial court diminished the cost of repair because of the predamaged condition of the roof, that is, for depreciation. The reason for awarding more than the witnesses attested to goes unexplained, but Farmers does not cross-appeal. The amount of damages to be awarded is a determination solely for the fact finder, and its action in this respect will not be disturbed on appeal if it is supported by evidence and bears a reasonable relationship to the elements of the damages proved. *World Radio Labs. v. Coopers & Lybrand*, 251 Neb. 261, 557 N.W.2d 1 (1996). We find no error on the record in the trial court's award for the roof damage.

*Damage to Interior Ceilings.*

The trial court found that there was insufficient evidence to prove the interior damage was caused by the hailstorm. As stated, proximate cause is a question of fact to be determined by the trial court as fact finder, and will not be disturbed on appeal unless clearly wrong. See *Bean v. State*, 222 Neb. 202, 382 N.W.2d 360 (1986).

Roger Eledge testified that the roof had not leaked prior to the purchase of the insurance policy from Farmers and that he first noticed the wet ceiling around the fireplace shortly after the May 1991 hailstorms. After Davis repaired the chimney flashing, Roger Eledge looked for other ceiling problems and noticed that several of the second floor ceilings had waterstains. He testified that the waterstains on the ceilings were not present prior to May 1991 and were still occurring at the time of trial. Barbara Eledge testified that the leak and staining around the fireplace had stopped after Davis fixed the flashing. Young, the adjuster, included an amount for water damage to the interior ceilings in his appraisal of $1,082. However, Davis testified that when he looked at the ceilings shortly after the May 1991 storms, some of the ceiling damage looked fresh and some

looked older. He also testified that he could not tell where the water was entering the house and that it was possible all the damage originated from the chimney leak, a leak undisputedly unrelated to hail damage. As stated, Farmers' expert, Belina, testified that the roof was at the end of its useful life and described the cracking and curling of shingles due to age.

The trial court obviously was not persuaded that the damage to the interior ceilings was caused by the hail damage to the roof. The evidence supports the conclusion that it was just as likely due to the chimney leak and the age and condition of the roof. As already stated, the findings of the trial court on the question of proximate cause will not be disturbed on appeal unless clearly wrong, see *Bean v. State, supra*, and in reviewing a judgment of the district court for errors appearing on the record, we may not substitute our factual findings for those of the district court where competent evidence supports those findings, *Records v. Christensen*, 246 Neb. 912, 524 N.W.2d 757 (1994). We cannot say that the trial court's findings were clearly erroneous. Thus, we affirm the decision denying recovery to the Eledges for repair to the interior ceilings of their home.

*Attorney Fees.*

Section 44-359 states in pertinent part:

> In all cases when the beneficiary . . . brings an action upon any type of insurance policy . . . the court, upon rendering judgment against such company . . . shall allow the plaintiff a reasonable sum as an attorney's fee in addition to the amount of his or her recovery, to be taxed as part of the costs . . . except that *if the plaintiff fails to obtain judgment for more than may have been offered by such company . . . then the plaintiff shall not recover the attorney's fee provided by this section.*

(Emphasis supplied.)

Neb. Rev. Stat. § 25-901 (Reissue 1995) provides in pertinent part that "[t]he defendant in an action for the recovery of money only, may, at any time before the trial, serve upon the plaintiff, or his attorney, an offer in writing to allow judgment to be taken against him for the sum specified therein."

The facts concerning the attorney fees are not in dispute. The trial court awarded the Eledges a judgment of $1,000 plus costs,

the amount of costs not stated. The trial court also found that the Eledges had refused Farmers' pretrial offer to confess judgment in the amount of $1,100, and the court thus denied the request for attorney fees. The Eledges' costs were later taxed at $399.85. Farmers' written pretrial offer stated that it offered "to allow Judgment to be taken . . . for the sum of $1,100." Costs were not mentioned.

The Eledges argue that the trial court erred in failing to award reasonable attorney fees pursuant to § 44-359, because they obtained a judgment for $1,399.85 ($1,000 recovery plus $399.85 costs) which exceeds the $1,100 offer made by Farmers under § 25-901. Therefore, the Eledges argue, § 44-359 mandated an award of fees, since it is only if a plaintiff fails to obtain judgment for more than that offered by the insurer that attorney fees are not recoverable.

The issue is whether costs are included in the term "judgment" as used in § 44-359 for purposes of determining whether the judgment exceeds an offer made under § 25-901. We find no Nebraska case specifically addressing this issue. Farmers first argues that the issue was not presented to the trial court and may not be raised for the first time on appeal. See, e.g., *Hanigan v. Trumble*, 252 Neb. 376, 562 N.W.2d 526 (1997). We disagree. While the Eledges did not make the specific *argument* they now pose, clearly the *issue* of attorney fees under § 44-359 was pled and argued below. Given the sequence of events below, including the taxing of costs after the motion for new trial was argued and denied, we conclude that the issue is properly before us.

Statutory interpretation is a matter of law in connection with which an appellate court has the obligation to reach an independent, correct conclusion irrespective of the decision made by the court below. *Bank of Papillion v. Nguyen*, 252 Neb. 926, 567 N.W.2d 166 (1997); *Moore v. Eggers Consulting Co.*, 252 Neb. 396, 562 N.W.2d 534 (1997); *State v. Thieszen*, 252 Neb. 208, 560 N.W.2d 800 (1997).

Farmers contends that the Eledges *recovered* less than was offered prior to trial. Farmers argues that § 44-359 should be interpreted to segregate costs from the judgment. Section 44-359 does state that attorney fees allowed under its provisions are to be taxed as costs and that such attorney fees are to be "in addi-

tion to" the "recovery." It is apparently Farmers' contention that since the Legislature requires allowed attorney fees to be segregated from the recovery, and since attorney fees are costs, then § 44-359 should be interpreted to also require "segregation" of costs in general from "judgment." We disagree.

When settling upon the meaning of a statute, an appellate court must determine and give effect to the purpose and intent of the Legislature as ascertained from the entire language of the statute considered in its plain, ordinary, and popular sense, it being the court's duty to discover, if possible, the Legislature's intent from the language of the statute itself. *Kerrigan & Line v. Foote*, 5 Neb. App. 397, 558 N.W.2d 837 (1997). The pertinent part of § 44-359 provides that it is only if the plaintiff fails to obtain *judgment* for more than may have been offered by the company under § 25-901 that attorney fees are precluded. We must assume that the Legislature's selection of the word "judgment" in this portion of the statute rather than the word "recovery," as found in the earlier part, was intentional. Recovery obviously refers to the amount of money determined to be due the insured under the insurance policy in question. By choosing the term "judgment" and placing it in the equation for determining whether the plaintiff has obtained more than that offered under § 25-901, we thus assume the Legislature intended judgment to mean something other than simply that amount found due under the policy. Recovery, as found in § 44-359, is not synonymous with judgment, and we must determine whether the term "judgment," in its plain and ordinary meaning, includes court costs such as those awarded to the Eledges here.

Farmers asserts that "[c]osts have never been considered a portion of the judgment in Nebraska." Brief for appellee at 16. Farmers cites *Metcalf v. Hartford Acc. & Ind. Co.*, 176 Neb. 468, 126 N.W.2d 471 (1964), to support that proposition. *Metcalf* interpreted a predecessor statute to § 44-359 and held that, thereunder, the fees allowed were taxable as costs and constituted no part of the judgment for purposes of accruing interest on the judgment. As stated, the current version of § 44-359 also provides that attorney fees allowed are taxed as costs and are in addition to the recovery. That attorney fees, as costs, are

not included in the judgment for purposes of interest accrual does not answer the question of whether costs in general should be included in the judgment for purposes of § 44-359.

■ As a general rule, an award of costs in a judgment is a part of the judgment. See, e.g., *Muff v. Mahlock Farms Co., Inc.*, 186 Neb. 151, 181 N.W.2d 258 (1970) (award of costs in judgment is part of judgment, and power of court to change such award is coextensive with its power to vacate or modify judgment); *Rehn v. Bingaman*, 152 Neb. 171, 173-74, 40 N.W.2d 673, 675 (1950) ("'award of costs to the successful party is as much a part of the judgment entered as the damages allowed, and the court cannot, after the term, change this award except for some statutory cause allowing the court to set aside or modify its judgments at a subsequent term'") (citing *Smith v. Bartlett*, 78 Neb. 359, 110 N.W. 991 (1907)).

Other jurisdictions have interpreted statutes similar to § 44-359 and have determined that the judgment includes costs. In *Carlson v. Blumenstein*, 293 Or. 494, 651 P.2d 710 (1982), a case strikingly similar to the one at hand, the Oregon Supreme Court interpreted an attorney fees statute in connection with an offer of compromise statute similar to § 25-901. In that case, the defendants offered to allow judgment against them for $3,000. The plaintiffs rejected the offer and were awarded $2,717.04 plus interest, making the total award greater than $3,000. They were awarded $2,000 in attorney fees. This award was upheld on appeal, with the court stating that judgment normally includes an award of damages, costs, disbursements, and attorney fees. The *Carlson* court held that in comparing an offer with the judgment received, a court must compare the offer of compromise against the sum of the award plus the costs and recoverable attorney fees incurred up to the time of service of the offer. In addition, California courts have repeatedly held in several contexts that in determining whether a plaintiff has obtained a more favorable judgment than the settlement offered, attorney fees and costs are included in the judgment. See, e.g., *Wickware v. Tanner*, 53 Cal. App. 4th 570, 61 Cal. Rptr. 2d 790 (1997); *Wilson v. Safeway Stores, Inc.*, 52 Cal. App. 4th 267, 60 Cal. Rptr. 2d 532 (1997).

Obviously, under our statute, the attorney fees allowed thereunder are not included in the judgment for purposes of deter-

mining whether the judgment exceeds the offer, because attorney fees are allowed only *if* the judgment exceeds the offer. Nonetheless, the reasoning of the above cases is persuasive on the issue of whether costs should be included in the amount of the judgment obtained for purposes of determining whether that judgment exceeds the offer under § 25-901.

We hold that under § 44-359, in determining whether the insured has obtained judgment for more than the amount offered under § 25-901, costs, excluding attorney fees allowed thereunder, are included in the judgment in addition to the recovery under the insurance policy in question. The Eledges' judgment, consisting of the $1,000 recovery and $399.85 in costs, is greater than the $1,100 offered by Farmers in its offer made pursuant to § 25-901. Therefore, we reverse the lower court's denial of attorney fees and remand the cause for determination of reasonable attorney fees to be awarded the Eledges.

## CONCLUSION

For the foregoing reasons, we hereby affirm the district court's decision as it relates to the award of $1,000 for damage to the roof and to the refusal to award any sum for damage to the interior ceilings. The district court's denial of attorney fees is reversed and the cause is remanded for determination of reasonable attorney fees to be awarded to the Eledges.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.